# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| AIMEE RENEE JOHNSON, | Case No.: 0:23-cv-2391 |
| Plaintiff, | Judge: _____ |
| ST. LOUIS COUNTY DEPARTMENT OF HUMAN SERVICES; SARAH ANDERSON , *in her individual and official capacities;* HANNA CHECKETTS, *in her individual and official capacities;* KELLY THOMPSON, *in her individual and official capacities;* DESIRAE WILLIAMS, *in her individual and official capacities;* LINNEA MIRSCH, *in her individual and official capacities;* ANJENETTE DREILING, *in her individual and official capacities;* BENJAMIN STROMBERG, *in his individual and official capacities;* JENNIFER BARRY, *in her individual and official capacities;* LAURA YOKI, *in her individual and official capacities;* GAYLE KOOP, *in her individual and official capacities;* JOAN MAHLE, *in her individual and official capacities;* ROBIN BRADY, *in her individual and official capacities*, ELIZABETH CARVER, *in her individual and official capacities,* ESSENTIA HEALTH*,* SAINT LOUIS COUNTY BOARD, MINNESOTA COMMISSIONER OF HUMAN SERVICES, *in HIS/HER official capacities*, | **COMPLAINT AND JURY TRIAL DEMAND** |
| Defendants. | |

## NATURE OF THIS ACTION

1.      Plaintiff herein is the mother of two (2) autistic brothers, permanently removed from parents and home at ages three and a half (3 ½) and six (6) years old by the Defendants, and also permanently separated from each other.

2.      The removal, separations, and termination of parental rights profoundly violated the rights guaranteed for all citizens, including Plaintiff's, by the U.S. Constitution; and beyond that, the rights guaranteed for citizens with disability by the Americans with Disabilities Act (ADA), and related state and federal law.

3.      Defendants' actions herein reflect the systemic unfairness cited by the Minnesota Supreme Court as it quoted from the U.S. Supreme Court's landmark decision pertaining to parental rights:

> The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers, whom the State has empowered both to investigate the family situation and to testify against the parents. **Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination**.

*Santosky v. Kramer,* 455 U.S. 745, 764, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)) (internal citations omitted). Cited by *In re Child of B.J.-M. & H.W.*, 744 N.W.2d 669, 672 (Minn. 2008) (emphasis added).

4.      The ADA however goes beyond those fundamental constitutional rights at issue in *Kramer*. The ADA gives added protection to the disabled, for those important reasons cited by the U.S. Congress in the text of the ADA itself:

1

> Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.

*42 USC 12101(a)(2)*. The need and the national outcry for protection of disabled individuals is exemplified by Defendants' actions in this complaint.

5.      Plaintiff herein seeks justice by way of declaratory relief, injunctive relief, and damages.

## JURISDICTION

6.      This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1331 (federal question), U.S.C. § 1343 (relief for protection of civil rights), U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act).

7.      Plaintiffs bring this suit under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"); and 42 U.S.C. 1983 "Civil Action for Deprivation of Rights" ("Section 1983").

8.      This Court has supplemental jurisdiction over any related state law claims pursuant to 28 U.S.C. § 1367(a). Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience and fairness to the parties.

9.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

10.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), because most of the Parties reside in this district and most of the Parties reside in the State of Minnesota pursuant to 28 U.S.C. § 1391(b)(2); because the events or omissions giving rise to the claims occurred in this district pursuant to 28 U.S.C. §1391(b)(2); and because Defendants are subject to personal

jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought pursuant to 28 US.C. 1391(b) (3).

## PARTIES

### Plaintiff

11.     Aimee Johnson is the biological mother of L.J. (DOB 2010) and N.J. (DOB 2012), two brothers diagnosed and treated for autism, defined as "qualified individuals with disabilities" under the ADA (42 USC 12102(1)(A).

12.     Ms. Johnson herself is a "qualified individual with disability" under two separate ADA definitions.  First, Defendants have given her a "record of disability" (42 USC 12102(1)(B)); and second, Defendants have "regarded" her as disabled (42 USC 12102(1)(C).

13.     Ms. Johnson is a citizen of the United States, and a resident of the State of Minnesota, currently residing in the City of Duluth.

### Defendants

### ST. LOUIS COUNTY DEPARTMENT OF HUMAN SERVICES

14.     The "SLC DHS" is the "local social services agency" responsible for administration of the State of Minnesota's "public child welfare program" pursuant to Minn. Stat. 393.07 Subd. 1 and Subd. 2.

### SARAH ANDERSON, ST. LOUIS COUNTY SOCIAL WORKER

15.     Sarah Anderson, at all times pertinent to this Complaint, was a social worker employed by St. Louis County and was responsible for providing services to Plaintiff and her family from at least September 2015 through June 2016.

16.     As fully set forth in the factual allegations below, Defendant Anderson violated Plaintiff's ADA and Constitutional rights both by herself individually, and by conspiring with the

3

other individually named Defendants not only by withholding mandated assessments and services, but by actively working against parental rights, sibling rights, family reunification, best interests of the children as defined by law, and other state programs and activities.

**HANNAH CHECKETTS, ST. LOUIS COUNTY SOCIAL WORKER**

17.     Hanna Checketts, at all times pertinent to this Complaint, was a social worker employed by St. Louis County and was responsible to provide services for Plaintiff and Family at least from June 2016 through mid-2018.

18.     As fully set forth in the factual allegations below, Defendant Checketts violated Plaintiff's ADA and Constitutional rights both in her official capacity, by herself individually, and by conspiring with the other individually named Defendants not only in withholding mandated assessments and services, but by actively working against parental rights, sibling rights, family reunification, best interests of the children as defined by law, and other state programs and activities.

**KELLY THOMPSON, ST. LOUIS COUNTY SOCIAL WORKER**

19.     Kelly Thompson, at all times pertinent to this Complaint was a social worker employed by St. Louis County and was responsible to provide services for Plaintiff and Family at least from February 2017 through January 2018, and also after the Termination of Parental Rights ("TPR") proceedings which took place in January and February 2018.

20.     As fully set forth in the factual allegations below, Defendant Thompson violated Plaintiff's ADA and Constitutional rights both in her official capacity, by herself individually, and by conspiring with the other individually named Defendants not only by withholding mandated assessments and services, but by actively working against parental rights, sibling rights, family

4

reunification, the children's best interests as defined by law, and other state programs and activities.

## DESIRAE WILLIAMS, ST. LOUIS COUNTY "CASE MANAGER" FOR DEVELOPMENTALLY DISABLED

21.     Desirae Williams, at all times pertinent to this Complaint, was a social worker employed by St. Louis County and was designated as "case manager" for Plaintiff and Family at least from 2016 through mid-2018 pursuant to the Minnesota Comprehensive Children's Mental Health Act, Minn. Stat.  245.487 to 245.4889, and specifically Minn. Statutes. 245.4871 Subd.4; 245.4875, subdivision 8; and 241.4881 Subd. 1.

22.     The Act specifies Ms. Williams' statutory responsibilities, which are intended to fulfill state and federal obligations to children with disabilities, and state requirements under the ADA and Section 504.

23.     Those responsibilities require Defendant Williams to oversee and coordinate social workers and all other service providers for L.J. and N.J., and to assure they receive all of the rights and benefits of federal and state legislation and programs for individuals, and specifically for children with disabilities.

24.     As fully set forth in the factual allegations below, Defendant Williams violated Plaintiff's ADA and Constitutional rights both in her official capacity, by herself individually, and by conspiring with the other individually named Defendants not only by withholding mandated assessments and services, but by actively working against parental rights, sibling rights, family reunification, the children's best interests as defined by law, and other state programs.

**LINNEA MIRSCH, DIRECTOR, ST. LOUIS COUNTY DEPT. OF PUBLIC HEALTH AND HUMAN SERVICES**

25.     Linnea Mirsch, at all times pertinent to this complaint, was the director of St. Louis County Department of Public Health and Human Services.

26.     Ms. Mirsch was responsible for training, supervision, actions, and conduct of Defendants Ms. Anderson, Ms. Checketts, Ms. Thompson, and Ms. Williams.

27.     As fully set forth in the allegations below, Ms. Mirsch failed to train, oversee, supervise, and assure "individualized" assessments and "individualized" services for Plaintiff, her family, and the sibling children. State services include, but are not limited to, removal from the home, reunification, sibling rights, visitations, protection from maltreatment, and out of home placement with relatives.

28.     Ms. Mirsch either recklessly failed to verify the truth of statements made by her subordinates, or knew of their falsity, and officially endorsed those false statements submitted to the juvenile court, and used for the purpose of deceiving the juvenile court.

29.     Decisions and actions by Director Mirsch are "official policy" of the St. Louis County Dept of Health and Human Services.

**ANJENETTE DREILING, SOCIAL WORK SUPERVISOR, ST. LOUIS COUNTY**

30.     Anjenette Dreiling, at all times pertinent to this Complaint, was a social work supervisor employed by St. Louis County.

31.     Defendant Dreiling was responsible for training, supervision, actions, and conduct of Defendants Ms. Anderson, Ms. Checketts, Ms. Thompson, and Ms. Williams.

32.     Ms. Dreiling failed to ensure that the ADA's individualized assessments and services were provided.

6

33.     Ms. Dreiling affirmed the patently false narrative that the children had no emotional connection to their parents nor to each other to justify their separation from parents and each other, with the purpose of defeating the objectives of state child protection programs, and avoiding accommodations to those programs under the ADA, Section 504, and other state and federal law enacted for the benefit of these disabled children and their family.

34.     Ms. Dreiling acquiesced in the emotional abuse, and the physical abuse or neglect, suffered by Plaintiff's disabled children in the custody of her social services department.

35.     Ms. Dreiling failed to verify the truth of statements made by her subordinates, and signed her name to those statements.

36.     The actions and inactions assisted or undertaken by Ms. Dreiling, include, but are not limited to, co-authoring, signing, and filing with the juvenile court on May 4, 2017 the petition for termination of Plaintiff's parental rights.

37.     Ms. Dreiling failed to verify the truth of statements made by her subordinates, incorporated and promulgated by Ms. Dreiling in the Petition for Termination of Parental Rights of Plaintiff filed with the juvenile court on May 4. 2017. Ms. Dreiling knew, or should have known the falsity of the information propounded in that Petition.

38.     The petition was filed with the intention to deceive the juvenile court with numerous statements which Ms. Dreiling knew or should have known to be false.

39.     As fully set forth in the factual allegations below, Ms. Dreiling acted against the best interests of the children, against the rights of Plaintiff, children, and family under the U.S. Constitution, the ADA, Section 504, and related law.

40.     Ms. Dreiling conspired with the other individual Defendants in their actions and inactions, in their combined efforts to terminate parental rights, to deny services mandated by the ADA and Section 504.

## BENJAMIN STROMBERG, ASSISTANT ST. LOUIS COUNTY ATTORNEY, DIVISION HEAD, CHILD WELFARE SERVICES

41.     Benjamin Stromberg,  at all times pertinent to this Complaint was an assistant St. Louis County Attorney employed by St. Louis County pursuant to Minn. Stat. 388.10

42.     Defendant Stromberg is the Division Head of the Child Welfare Division of the St. Louis County Attorney's Office.  Mr. Stromberg's actions constitute official policy for the Child Welfare Division of the Office of the County Attorney.

43.     Mr. Stromberg participated as chief prosecuting attorney against Plaintiff in termination of her parental rights, was aware and actively supported all decisions, actions and inactions of the other Defendants in this matter, reviewed and submitted the records and false testimony used against Plaintiff, the children, and family.

44.     Mr. Stromberg also participated in functions unrelated to prosecution, including but not limited to consulting with other Defendants on social service issues, such as setting parameters and limitations for family visitations.

45.     Mr. Stromberg, as further specified in the allegations below, actively worked with the other Defendants to deceive the juvenile court, to work against the best interests of the children, and to abrogate Plaintiffs rights under the U.S. Constitution, the ADA, and related law.

46.     Mr. Stromberg failed to verify the truth of statements made by his informants, which statements were incorporated, promulgated, and prosecuted by Mr. Stromberg in the Petition for Termination of Parental Rights of Plaintiff filed with the juvenile court on May 4. 2017

8

and tried on January 16, 2018.  Mr. Stromberg knew or should have known the falsity of the information propounded in that Petition.

47.     The petition was prosecuted with the intention to deceive the court, and to defeat the rights of Plaintiff, the children, and family.  The petition included numerous statements which Mr. Stromberg knew or should have known to be false.

48.     Mr. Stromberg also participated in the decision to violate the promises of parental visitations which he made to Plaintiff in the termination proceedings on January 16, 2018, in exchange for her consent for "voluntary" termination of parental rights.

49.     Mr. Stromberg in 2022 also prosecuted St. Louis County's opposition to Plaintiff's Petition for Reestablishment of the Legal Parent-Child Relationship.

50.     Mr. Stromberg by the above actions and others participated and conspired with the other individual Defendants to further and achieve their common goal of separating the siblings, terminating parental rights, and defeating the state and federal programs, policies, and objectives for preservation of the family, as more fully explicated in the paragraphs below.

**JENNIFER BARRY, ASSISTANT ST. LOUIS COUNTY ATTORNEY**

51.     Jennifer Barry, at all times pertinent to this Complaint was an assistant St. Louis County Attorney employed by the County pursuant to Minn. Stat. 388.10.

52.     As fully set forth in the factual allegations below, Defendant Ms. Barry at all times pertinent hereto assisted Defendant Mr. Stromberg in his actions and inactions in abrogation of Plaintiff's rights under the U.S. Constitution, the ADA, and related law.

53.     The actions and inactions assisted or undertaken by Ms. Barry include, but are not limited to, authoring and filing with the juvenile court on May 4, 2017 the petition for termination of Plaintiff's parental rights.

9

54.     Ms. Barry also participated in functions unrelated to prosecution, including but not limited to consulting with other Defendants on social service issues, such as setting parameters and limitations for family visitations.

55.     Ms. Barry failed to verify the truth of statements made by her informants, which statements were incorporated and promulgated by Ms. Barry in the Petition for Termination of Parental Rights of Plaintiff filed with the juvenile court on May 4. 2017 and tried on January 18, 2016.  Ms. Barry knew or should have known the falsity of the information propounded in that Petition.

56.     The petition was filed with the intention to deceive the court, and to defeat the rights of Plaintiff, the children, and family under the ADA, U.S. Constitution, and related laws.  The petition included numerous statements which Ms. Barry knew or should have known to be false.

57.     Ms. Barry in 2022 also prosecuted St. Louis County's opposition to Plaintiff's Petition for Reestablishment of the Legal Parent-Child Relationship.

58.     Ms. Barry by the above actions and others participated and conspired with the other individual Defendants to further and achieve their common goal of separating the siblings, terminating parental rights, and defeating state and federal programs, policies, and objectives for preservation of the family, as more fully explicated in the paragraphs below.

**LAURA YOKI, FOSTER HOME OWNER AND PROVIDER**

59.     Defendant Laura Yoki at all times pertinent to this Complaint was the owner and operator of her foster home,  under license by the State of Minnesota pursuant to Minn. Stat. 235A.

60.     Defendant St. Louis County contracts for services with the Yoki foster home, a portion of which are paid through federal funding.

10

61.     The Yoki foster home provided services to L.J. for one month in 2016, and for N.J. from 2016 to 2019, and subsequently through the adoption of N.J.

62.     Ms. Yoki at the behest of others of the Defendants, in conspiracy with them, and for her own financial benefit, actively worked for the termination of parental rights of the Plaintiff, to restrict visitations, separate siblings, submit false statements to the juvenile court, and take numerous actions with "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

63.     Ms. Yoki's actions, taken in concert with the other Defendants, as fully set forth in the factual allegations below, intentionally deprived Plaintiff's of rights under the U.S. Constitution, the ADA, and related law.

**GAYLE KOOP, FOSTER HOME OWNER AND PROVIDER**

64.     Defendant Gayle Koop at all times pertinent to this Complaint, was the owner and operator of her foster home businesses,  under license by the State of Minnesota pursuant to Minn. Stat. 245A.

65.     Defendant St. Louis County contracts for services with the Gayle Koop Foster Care LLC.  4008 Pitt St,. Duluth MN  55804.

66.     Gayle Koop Foster Care provides services including, but not limited to:

Basic Support Services: Respite care, in home or out-of-home

Intervention Support Services: Crisis respite, in-home or out-of-home

In-Home Support Services: Individualized home supports, Individualized home supports with training, Individualized home supports with family training

Residential Supports and Services: Foster Care services or supported living services, Community residential services, Family residential services

11

67.    The Koop foster home has provided services to L.J. from 2016 to present. Defendant Koop and Gayle Koop Foster Care receive funding from the state and federal government.

68.    The Koop foster homes have serviced hundreds of children, by Ms. Koop's own accounting.  They have special licensure from the State of Minnesota to obtain extra funding for care of disabled individuals such as L.J.  Extra funding was the reason given for his placement with the Koop Foster Home.

69.    Ms. Koop at the behest of others of the Defendants, and for her own financial benefit, assisted by providing false testimony to the juvenile court for the purpose of terminating Plaintiff's parental rights, separating the siblings, working against their best interests, with "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

70.    Ms. Koop's actions, taken in concert with the other Defendants, as fully set forth in the factual allegations below, intentionally deprived Plaintiff's of rights under the U.S. Constitution, the ADA, and related law.

**GUARDIAN AD LITEM JOAN MAHLE**

71.    Joan Mahle, was appointed by the juvenile court as guardian ad litem ("GAL") for N.J. from 2016 until he was adopted by the Yoki Foster Home in 2019; and appointed GAL for L.J. from 2016 to present.

72.     The GAL was appointed pursuant to Minn. Stat. 260C.163 Subd.5; Rule 37 Minn. R. Juv. Prot. P.; and Minn. Rules of General Practice for the District Courts 901-907.  These are state programs subject to ADA requirements.

73.     Defendant Mahle cooperated completely and participated in the conspiracy with the other Defendants to terminate all parental, sibling, and family rights; and to permanently separate the Children from parents, family, home, and each other.

74.     Defendant Mahle failed to conduct independent investigations, which is a state program and service for the disabled children.

75.     Ms. Mahle failed to advocate for the children's best interests in regard to visitations, sibling placement, relative placement, and services to which they were entitled pursuant to the ADA and related law.

76.     Ms. Mahle failed to monitor the child's best interests throughout the proceedings, including but not limited to the failure to acknowledge, report, and assure services to ameliorate ongoing severe emotional trauma experienced and exhibited by N.J and L.J.

77.     Ms. Mahle failed to advocate and investigate when evidence of physical abuse or neglect of N.J. and L.J. was apparent at visitations.

78.     Ms. Mahle failed to advocate for services, evaluations, and procedures required for the disabled Boys as exposited in the paragraphs of this complaint pursuant to: Title II of the  ADA, 42 USC 12131-12134; Section 504 of the Rehabilitation Act of 1973 as amended; 28 CFR  PART 35 - Dept of Justice Regulations implementing the ADA; Families First Prevention Services Act of 2018; Developmental Disabilities Assistance and Bill of Rights Act of 2000'. (42 USC §§ 15001 - 15115); Families of Children With Disabilities Support Act of 2000  (42 USC 15091 et. Seq.; the juvenile protection provisions of the Juvenile Court Act, Minn. Stat. 260C.001 to 260C.637; the

13

"Foster Care Sibling Bill of Rights" (Minn. Stat. 260C.008); and the "Minnesota Comprehensive Children's Mental Health Act." Minn. Stat. 245.487 to 245.4889.

79.    Defendant Mahle has failed to advocate, service, support, and enforce the program of visitations made before the juvenile court on January 16, 2018 and determined at that time to be in the Childrens' best interests.

80.    Defendant Mahle submitted reports to the juvenile court with information which she knew, or should have known, to be false for the purpose of deceiving the juvenile court, securing the termination of Plaintiff's parental rights protected under the U.S. Constitution, and denying services and defeating the purposes of the ADA, Section 504, and related law.

81.    Ms. Mahle by the above actions and others, consulted, participated, and agreed with the other Defendants to further and achieve their common goal of separating the siblings, terminating parental rights, and defeating state and federal objectives for preservation of the family, as more fully explicated in the paragraphs below.

**ROBIN BRADY, MEDICAL PROVIDER FOR L.J. AND N.J.**

82.    Ms. Robin Brady, was a pediatric nurse practitioner employed by Essentia Health in Duluth, providing medical care for L.J. and N.J.  She followed unlawful directives from the Defendant social workers, submitting false or misleading reports to justify separation of the siblings, and termination of parental rights.  She misled the Plaintiff regarding her activities pertaining to L.J. and N.J., and failed to inform the parents regarding medical care of the Children. She conspired in the actions to deny Plaintiff's and Childrens' rights under the U.S. Constitution, ADA, Section 504, and related law.

14

**ELIZABETH CARVER**

83.    Dr. Elizabeth Carver, is a clinical child psychologist employed by Essentia Health in Duluth, Minnesota.  Dr. Carver performed assessments for L.J. and N.J., failed to provide or recommend services for family unification, traumatic separation of the siblings from each other, parents, and family; failed to provide or recommend other individualized services required by the ADA, Section 504, and related law.  Dr. Carver conspired with the other individual Defendants to violate Plaintiff's rights under the U.S. Constitution, ADA, Section 504, and related law.

**ESSENTIA HEALTH**

84.    Essentia Health is a health care organization located and based in Duluth, Minnesota.  Essentia Health employs and supervises Defendants Robin Brady and Dr. Elizabeth Carver.

**ST. LOUIS COUNTY BOARD**

85.    The St. Louis County Board ("County Board") is a political subdivision of the State of Minnesota.  The Board is responsible for all aspects of the delivery of public adult and children's mental health services per Minn. Stat. 245.4874; 245.4875; 245.4884; and others.

86.    The County Board, and individual members, were informed of the events herein, to which they nonetheless acquiesced, and moreover made no inquiry, nor changes to their policies and practices pertaining hereto.  The actions of Defendants herein are taken pursuant to official policy, custom, and usage of St. Louis County and the County Board.

87.    Defendant social workers named as parties above, are unlicensed by the State.  They have been allowed exemption from this professional practice requirement by state law.  St. Louis

15

County has employed these unlicensed social workers without training them in regard to Plaintiff's

and others' rights under the U.S. Constitution, ADA, and related law.

## MINNESOTA COMMISSIONER OF HUMAN SERVICES

88.     The "Commissioner" is charged by the Minnesota legislature with ultimate

responsibility for the child welfare program pursuant to Minn. Stat. 393.07 Subd. 1, which states:

> The public child welfare program shall be supervised by the commissioner of human
> services and administered by the local social services agency in accordance with law and
> with rules of the commissioner.

## ALL DEFENDANTS

89.     All of the Defendant parties herein participated in programs intended to benefit the

Plaintiff and her children which were funded at least in part by the federal government.

90.     All of the Defendant Parties herein, at all times relevant, have been acting under

color of state law in concert, consultation, and active agreement with each other, for the purpose

and common goal of depriving Plaintiff of her parental rights, separating the siblings, and denying

"qualified individuals with disabilities" their rights pursuant to the ADA, Section 504, and related

federal and state law.

### FACTS COMMON TO ALL CAUSES OF ACTION

### INTRODUCTION

91.     Plaintiff herein alleges that Defendants have zealously pursued their goal of

terminating Plaintiff's parental rights by actions to intentionally defeat the protections afforded by

the U.S. Constitution, the ADA, Section 504, and related law.

92.     Defendants' unlawful conduct herein has been presaged and described perfectly by the U. S. Supreme Court in *Santosky,* as quoted above in paragraph #3, and elsewhere by the Minnesota Courts as follows:

> "Efforts to help parents generally are closely scrutinized, because public agencies may transform the assistance into a test to demonstrate parental failure. Matter of Welfare of E.L.H., 356 N.W.2d 795, 798 (Minn.Ct.App.1984) (Crippen, Judge, concurring specially)."

In re Welfare of J.H.D., 416 N.W.2d 194, 198 (Minn. Ct. App. 1987).

**THE JOHNSON-JORGENSON FAMILY**

93.     Plaintiff Ms. Aimee Renee Johnson and Mr. Jorgenson, father of L.J and N.J., have resided and partnered together in personal union for the past 14 years.  They have been fully and continuously employed.  They have no history of domestic discord, drug use or abuse, criminal or other illegal activities of any kind.  They are of sound moral constitution, attending to church and the religious and moral upbringing of their children.

94.     Plaintiff Ms. Johnson specifically has worked as a registered nursing assistant for 24 years, as PCA for teens in foster care, and as a sales clerk in various retail businesses.

95.     Ms. Johnson and Mr. Jorgenson are the biological parents of L.J. (DOB 2010) and N.J. (DOB 2012), collectively the "Boys", the "Siblings", or the "Children". Both boys have been diagnosed with autism spectrum disorder.  Ms. Johnson and Mr. Jorgenson raised the Boys in their home continuously since birth, with no problems beyond normal family issues, and the added stress and rigors of attending to the Boy's special needs.

96.     While under the care of their parents, the autistic Boys received regular medical care, educational, recreational, and social support services.  The Boys were never neglected nor

17

maltreated.  They were never placed in any danger of physical, emotional, nor other harm.  They were bonded normally and affectionately to the Parents, grandparents, and to each other.

97.     Services provided to L.J. and N.J. from birth through 2016, under supervision of their parents, included medical care and medications, developmental assessments and evaluations, and special mental health services.

## A TEMPORARY HOUSING ISSUE PRECIPITATED DEFENDANTS' UNLAWFUL SEPARATION OF CHILDREN AND FAMILY

98.     Plaintiff and her family struggled at times, but were able to keep the family together and functioning.  Mr. Jorgenson has worked at Menard's for many years, Plaintiff Ms. Johnson as a registered nursing assistant for 24 years, as PCA for teens in foster care, as a salesclerk in various retail jobs, and as mother caring for her special-needs children.

99.     Significant difficulties arose however, in February 2016 when Ms. Johnson and Mr. Jorgenson moved out of a rental home in suburban Duluth due to health concerns over a mold problem in the house.  The health concerns prompting Plaintiff's moving from the rental house were well documented, and Defendant social worker Sarah Anderson was well aware that health concerns were the reason which prompted the family's move.

100.    Nonetheless, Ms. Anderson, for the purpose of denigrating the Plaintiff, falsely alleged to the juvenile court in June 2016 that Plaintiff had lost housing by gambling away her rent money.  No mention was made of the mold problem. This same false allegation is reiterated through 2018 in the CHIPS and TPR petitions paragraphs "i" and "m".

101.    The same allegation appears and is propounded again in 2022 when Plaintiff petitioned under the "Reunification Act of 2013", Minn. Stat. 360C.329.

102.    This false statement, and the many other false statements by the Defendants as alleged in this complaint, have been magnified and multiplied in their effect, by their repetition in multiple reports, by multiple of the Defendants herein, to the juvenile court over the years spanning from 2016 to 2022.

103.    Defendants also stated falsely to the juvenile court that after moving out of the house in February 2016, and staying at the Grand Motel, that Plaintiff and children were kicked out of the Grand Motel at this time, due to uncontrolled behavior of the children.  This was entirely untrue.  Plaintiff was not kicked out of the Grand Motel, nor were the children unruly, as clarified in a letter from the Grand Motel owner.  This same false allegation was made repeatedly to the juvenile court by the other Defendants in 2016, 2017, and 2018; and propounded again in 2022 when Plaintiff petitioned under the "Reunification Act of 2013", Minn. Stat. 360C.329.

104.    Defendants including but not limited to Ms. Anderson., Ms. Checketts, and GAL Ms. Mahle (Report of 9/1/16) also reported falsely to the juvenile court throughout 2016 and 2017 that Plaintiff had failed to follow up with her appointments in June 2016 to secure housing. This was reiterated in the Petition to Terminate Parental Rights in 2017-18.  This false report was another one of the many false reports in Defendants' concerted effort to denigrate the Plaintiff and ultimately to set the stage for termination of her parental rights.  Plaintiff has documentation that in fact she did attend meetings which she was falsely accused of missing.  This same false allegation was made repeatedly to the juvenile court by many other Defendants in 2016, 2017, and 2018; and propounded again in 2022 when Plaintiff petitioned under the "Reunification Act of 2013", Minn. Stat. 360C.329.

105.    Defendants Anderson and Checketts also falsely stated that the Plaintiff had failed to follow up with meetings scheduled to consult with them on May 11, May 31, 2016, and other

19

times. This was an effort to denigrate the Plaintiff, deceive the juvenile court, and defeat the purpose of federal and state laws supporting parental and family rights. Plaintiff has contemporaneous notes and a calendar refuting the false statements.

106.    Not only did the Plaintiff show up for the meetings on those dates, but Ms. Anderson was absent herself, and subsequently laid blame on the Plaintiff in reports to the juvenile court.

107.    In regard to those appointments that Plaintiff allegedly missed, the Children's father Mr. Jorgenson took May 31, 2016 off from work, and lost much needed income, to attend one of the meetings at which Ms. Anderson failed to show up. Yet Defendants repeatedly and persistently in reports to the juvenile court in 2016, 2017, and 2018 denigrated Mr. Jorgenson for not participating in this and other meetings. These false allegations against Plaintiff and Plaintiff's partner were made repeatedly to the juvenile court by the other Defendants in 2016, 2017, and 2018; and propounded again in 2022 when Plaintiff petitioned under the "Reunification Act of 2013", Minn. Stat. 360C.329.

108.    After moving out of the moldy rental home, Plaintiff found it more difficult than anticipated to find appropriate and affordable rental housing. Therefore, after a month of staying in hotels, and depleting financial resources, on March 16, 2016 and for several months thereafter Plaintiff requested respite care and housing assistance from the Defendants. This assistance, although required by state and federal law due the Children's disabled status, was never provided.

109.    Defendant Ms. Mahle, GAL for the children, stated falsely in her report to the juvenile court of 9/1/2016 that Plaintiff was offered and refused respite care. This is refuted by Plaintiff, and reports of other Defendants on the record, such as the Petition to Terminate Parental Rights paragraph (h).

110.    Instead of providing respite care, or housing assistance, as requested by Plaintiff, Defendant Ms. Anderson convinced Plaintiff to sign a document on June 6, 2016, which Ms. Anderson stated was for "respite care". The document, however, was Plaintiff's consent for placement in "voluntary foster care". The deception was discovered by Plaintiff the next day, when Plaintiff's children were not allowed to return home. From this point forward, the children would never be allowed to return home.

111.    At this point also, Plaintiff began to realize that Defendants had no intentions of helping the family, but rather were committed to breaking up the family. This was further reinforced by other actions of the Defendants which followed over the next month, in June-July 2016, and confirmed throughout the ensuing years of Plaintiff's interaction with the Defendants to the present time.

112.    Plaintiff's concerns appear on the record. They were further confirmed in a phone conversation with Defendant Ms. Checketts on October 4, 2016, three (3) months after the children were removed from their home, wherein Ms. Checketts stated that the Children would never be returned.

113.    Defendant Ms.Yoki had seen N.J. as a profitable commodity, and was already working with her business associates, including St. Louis County workers, Nurse Practitioner Robin Brady, and Elizabeth Carver, to assure N.J. would remain at her foster home. Ms. Yoki's intentions to defeat reunification are clear from her actions, including false and outrageous statements to Dr Carver, such as one that Plaintiff had L.J. drinking gasoline, as well as many other actions by Ms. Yoki which included withholding visitations between N.J. and his parents.

114.    Defendants as early as June 2016, at the time of removal of the Children from their home, had already failed to provide services required by the ADA and related law, including

21

housing, respite care, individualized services and assessments intended by law for the purpose of keeping the children' and family together.

115.    Not only did Defendants fail to assist the family, but worked actively against them, continuously from 2016 onward, through their false reports to the juvenile court, denial of visitations, and other actions, with "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

116.    Defendants took the Boys into custody on June 15, 2016, filed a CHIPS petition on June 20, 2016 (69DU-JV-16-519) and obtained an emergency protective order on that same date.

117.    Plaintiff secured stable housing on June 24, 2016. This was accomplished without any of the assistance from the Defendants which was required of them by law.  However, this resolution of the housing problem was not revealed to the juvenile Court in reports by the Defendants.  This deception of the juvenile court regarding Plaintiff's housing situation was intentional, and continued for more than two (2) months after housing had been secured

118.    The CHIPS Petition (paragraph (bb)) falsely stated "The family has been homeless, staying at shelters and motels, since August 2015.".  This was a false statement, intended to undermine the Plaintiff, and create rather than solve problems for the disabled Boys and the Family.

119.    Contrary to the above statement, Plaintiff and family were not "homeless", and their housing instability lasted only from Feb-June 2016.  This was a period of 5 months, and not 12 months as falsely reported to the juvenile court by Defendants in their CHIPS petition, and repeatedly in 2016, 2017, and 2018.

120.    Moreover, the housing problem was atypical for Plaintiff and family. This five (5) month period was the only such time of uncertain housing they had ever experienced through their 14 years together, to the present time.

121.    The acquisition of stable housing was not reported to the court.  This resolution of the housing problem through the solo efforts of Plaintiff and Mr. Jorgenson, eliminated the housing emergency. Ms. Checketts overtly deceived the court in her report of July 8, stating "Ms. Johnson remains homeless".

122.    It was not until more than two (2) months of safe, stable housing, and over two (2) months of ongoing separation of the family and siblings from each other, that Defendant Ms. Checketts informed the juvenile court that housing had been secured, in her report of 9/14/2016.

123.    Defendants' reports to the court intentionally fail to mention that during this stressful five (5) month period of unstable housing, Plaintiff managed to keep the children in school, keep their medical appointments, and continue with the special services she had arranged for them –with none of the assistance from the Defendants which they were required by law to provide for disabled persons.

124.    The five (5) month time frame of uncertain housing which Defendants exaggerated to "12 months of homelessness", the inaccurate and disparaging "homeless" labeling, the false statements even after Plaintiff had secured safe and stable housing, all of these falsifications reported and repeated dozens of times to the juvenile court, over the course of several years from 2016 to 2018, by numerous individual Defendants herein, exemplifies the entire narrative of the Defendants. These are but a few examples of the many varieties and instances of false and disparaging statements, repeated by many Defendants, over many years.

125.    These intractable and malicious actions were propagated by the Defendants who were in constant contact with each other, each of them reiterating the same false statements to the juvenile court. The statements and actions were done in concert, by mutual agreement between the Defendants, intended for "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

126.    In keeping with the observations of the U.S. Congress in paragraph 4 above, but for the Defendants' failure to assist Plaintiff with some minimal services at this early time in 2016, with housing and respite care as the Plaintiff had requested, and as required by law, Plaintiff's family would have remained together.

**A CHIPS PETITION UNLAWFULLY REMOVED THE CHILDREN FROM THEIR HOME WITHOUT A "DIRECT THREAT" FROM 2016-2018.**

127.    At this time, in June 2016, there had been no "individualized assessments" nor "individualized services" offered nor provided to Plaintiff and family.  Her specific requests for respite care and housing assistance, required by the ADA and related law, were intentionally unfulfilled by the Defendants.

128.    Instead of services, Defendant social worker Ms. Anderson removed the disabled children from their home, by initiating a "police hold" on June 15, 2016.  From that day onward, at ages 3 1/2 and 6, the children would remain under the complete custody and control of St. Louis County, and they would never return to home and family.  Parental rights were effectively extinguished at that time.

129.    The emergency petition was based upon false statements by Ms. Anderson, including but not limited to being kicked out of the Grand Motel (paragraph i); being  "homeless

for nearly a year" (paragraph "p"); "all money spent on gambling" (paragraph "i"); "missed housing and other appointments" (paragraph "j"); emotional instability of Plaintiff (paragraphs "w", "x", "y") and many others, most of which were repeated throughout 2017 and 2018, and included in the Petition for Termination of Parental Rights prosecuted in 2017-18.

130.    The emergency petition for removal was granted by the juvenile court on 6-20-2016. The removal violated the ADA, for failure to verify any threat to the disabled children as required by 28 CFR 35.139(b).

131.    Contrary to law, there was no evidence of any past injury or present threat to the children under parental care, in their own home. Documentation with "objective evidence" of a "direct threat" is required by the ADA, to justify removal of the Children according to ADA regulations 29 CFR 35.139(b). Nor was there any evaluation of "reasonable modifications [that] will mitigate the risk":

> "In determining whether an individual poses a **direct threat** to the health or safety of others, a **public entity** must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether **reasonable modifications** of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."

29 CFR 35.139(b).

132.    The very reason for this provision in federal law is to avoid exactly what happened to Plaintiff and her children. These unjustified removals have been historically perpetrated by public agencies such as the Defendants, imposing unnecessary restrictions upon the rights of disabled persons.

133.    The CHIPS Petition was filed on June 20, 2016. The Petition was composed mainly by social worker Ms. Anderson, submitted by Dave Vukelich as "social services supervisor", and

consisted of numerous false statements by Ms. Anderson and others, a sampling of which have been alleged above in paragraphs 100, 103, 109, 118, and 129.

134.     As one example of many false statements, the Petition at paragraph (p) states:

"Ms. Anderson pointed out that Ms. Johnson had been homeless for nearly a year, and had received SSI money during the entire time she was homeless, yet she did not use the money for housing, which is concerning."

135.     Such false statements as this were intended to disparage the Plaintiff, and threaten her parental rights, with "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program (housing, family preservation, et.al.) with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

136.     The CHIPS petition continued the removal of the children from their home and family while it was in effect from June 2016 through February 2018, without demonstrating at any point during that time a "direct threat" to the children as required by the ADA and 28 CFR 35.139(b).

137.     There were numerous statutory reviews of the out-of-home placement by the Defendants and the juvenile court during this eighteen (18) month period.   At no time did Defendants demonstrate a threat to the children as required by the ADA and 28 C.F.R. 35.139(b).

138.     To the contrary, Defendants implemented three psychological evaluations of the Plaintiff, on July 5, 2016 (Nystrom and Associates), August 15 and 29, 2016 (Duluth Psychological Associates), and July 10, 2017 (Arrowhead Psychological Associates).   None of these assessments indicated that the Plaintiff posed a threat to her children.   Yet the children remained in out-of-home placement in violation of the ADA and 28 C.F.R. 35.139(b).

139.    To the contrary, as alleged below with specificity in paragraphs #230 - #254, there were well documented indications of physical and emotional trauma and maltreatment to the children by the Defendants themselves during their out-of-home placement from 2016-2018.

140.    Defendants made no effort to assess the non-existent threat to the Children in their own family home, as required by the ADA; and conversely made no effort to assess or mitigate the trauma and maltreatment of the Children in out-of-home placement.

141.    Defendants tried hard to prove that Plaintiff was mentally and emotionally incompetent, ordering the three psychological assessments, and hoping for evidence from the psychological assessments that she was dangerous to her children.

142.    They were disappointed with the results, which showed no threat to the children. However, when the results didn't support their efforts to terminate rights and remove the Children, Defendants ordered more psychological assessments, and took actions to change the results to fit their agenda.

143.    The first assessment from Nystrom Associates on July 16, 2016, only a month after the children had been removed from their home, found:

"Aimee's strengths include: motivated to change, a positive mindset, a positive support system and paying attention to detail, being a good mother.

"Aimee's limitations include: faced with challenging circumstances"

144.    "Faced with challenging circumstances" is a euphemism for the malicious actions of the Defendants, and their failure to provide services as required by the ADA.

145.    This psychological assessment was the opposite of what Defendants needed to support their goal of terminating parental rights; therefore, they immediately ordered a second psychological assessment by a different agency, which Defendants attempted to manipulate by

supplying false and pejorative information to the evaluator, which they had not done for the Nystrom evaluation a month earlier.

146.    The second evaluation took place on August 15 and 29, 2016, by Arrowhead Psychological Associates, based upon the pejorative and false information provided by Defendants, for example:

> "In December 2013 Mr. Jorgenson allegedly punished L.J. by putting his head in a toilet and flushing it. Ms. Johnson declined SLCHS services."

> "Ms. Johnson was difficult to reach, and did not follow through on meetings, including a meeting for emergency housing support.  She 'often requested that her children be placed in foster care."

> "Ms. Johnson had threatened to kill herself and her children"

147.    Despite this false information provided by the Defendants, evaluator Dan D'Allaird found no danger nor threat to the children.

148.    Defendants attempted one final time, a year later, in the months leading up to Plaintiff's adjudication of parental rights, to manipulate and elicit a more negative psychological evaluation of Ms. Johnson, by yet a third evaluator, working for yet another different medical provider.  Once again Defendants were unsuccessful in showing any threat or danger posed by the Plaintiff to her children.

149.    This final evaluation took place on July 10, 2017, by Jane Baillargeon at Arrowhead Psychological Clinic, again based upon false and pejorative information provided by Defendants. Still the evaluator found no evidence of a threat or danger to Plaintiff's children.

150.    Despite these multiple evaluations, and despite any evidence that L.J. or N.J. had ever been harmed nor endangered nor neglected in the past, Defendants continued their out-of-home placement without interruption in 2016, 2017, and 2018, in clear violation of ADA mandates.

**PLAINTIFF WAS LABELED AS DISABLED BY DEFENDANTS, AND GIVEN A RECORD OF BEING DISABLED BY THE DEFENDANTS, FROM JUNE 15, 2016 TO PRESENT**

151.    The label of disability given to the Plaintiff, described as "emotional instability", was stated as the reason which necessitated the Children's emergency removal from the home on a police hold, on June 15, 2016.

152.    This "record of disability" was recited by the Defendants in numerous documents after June 15, 2016 through the present.  At no point has this "record of disability" been rescinded, modified, nor corrected by the Defendants from June 15, 2016  through the present.

**PLAINTIFF WAS "REGARDED AS DISABLED" BY DEFENDANTS, FROM JUNE 15, 2016 THROUGH THE PRESENT**

153.    Despite all of the evidence to the contrary, including the three psychological evaluations ordered by the Defendants themselves, Defendants "regarded Plaintiff as emotionally and mentally disabled" from June 15, 2016 through the present, to deceive the juvenile court, justify their efforts to deny parent-child visitations, break up the Plaintiff's family, ultimately to terminate Plaintiff's parental rights, and in 2022 to deny Plaintiff's Petition for Reestablisment of the Legal Parent-Child Relationship pursuant to Minn. Stat. 260C.329.

154.    At no time from June 15, 2016 through the present, did the Defendants discontinue or modify their "regard" of Plaintiff as disabled, which they had contrived to deceive the juvenile court, justify their efforts to deny parent-child visitations, break up the Plaintiff's family, and ultimately to terminate Plaintiff's parental rights.

155.    At no point did the Defendants offer Plaintiff Aimee Johnson, whom they labelled and regarded as disabled, to provide individualized assessments or services to Plaintiff and her family, as required by the ADA.

**DEFENDANTS TOOK IMMEDIATE STEPS TO IMPOSE WHAT THEY CALLED "THE NEW NORMAL" UPON THE CHILDREN, TO ALIENATE THEM FROM THEIR FAMILY AND EACH OTHER, REPUGNANT TO ADA AND CONSTITUTIONAL PROTECTIONS**

156.    Defendants at the time of the Children's removal from their home, in June 2016, rapidly took definitive actions to establish what Defendant Thompson later calls **"The New Normal"**.

157.    **"The New Normal"** is defined by Ms. Thompson herself as a situation of minimal sibling contact, minimal contact with parents and other family members, no birthdays, no Christmas, total disregard of the biological parents, complete domination by St. Louis County, and disrespect for the children because they don't "**seem to have the cognition to really understand this…**"

158.    Defendants' actions to establish "**The New Normal**" began promptly after taking control of the Children in June 2016.  **"The New Normal"** began with permanent separation of the siblings as demonstrated below, and with minimal visitations with family as demonstrated below.  These actions of the Defendants were intended to begin the process of alienation, and breaking up the family.

159.    **"The New Normal"** is described by Defendant Ms. Thompson in the pretrial report to the juvenile court of 1-4-18, documenting Defendants' patronizing opinions, including that N.J. "didn't seem to have the cognition to really understand" birthdays, Christmas, family, etc.

> "On 12/4/17 I discussed with Aimee her wanting to have a visit with both boys and several family members to celebrate N.J.'s birthday.  I cautioned her that this sounded very overstimulating for both boys and that they didn't handle changes in their routines very well and that adding on top of re-introducing them together that here would suddenly be family members that they hadn't seen in a while and presents and chaos.  Aimee indicated that they had always had birthday parties for the boys when they were with them.  **I reminded her that they have not been in her care for a year and a half and that they have a new normal when it comes to what they are "used" to.  I further asked Aimee**

30

**if N.J. was really aware of his birthday and if a party was necessary for him given that he didn't seem to have the cognition to really understand this**....I indicated that I would need to take this under advisement and check with the GAL and our county attorney. I further consulted with my supervisor....L.J. would not be able to come for safety reasons....Aimee was not happy with this decision and further **asked me to reconsider allowing the boys to have a family visit for Christmas** as this time of year is about family and that it wasn't nice of me not to allow this since they have followed all the rules. **I reminded Aimee that my role wasn't about being nice but rather to gauge the necessary safety of her children and make decisions in consultation with those involved with the case on what was best for them."**

## DEFENDANTS UNLAWFULLY SEPARATED THE SIBLING BROTHERS

160.    Placement of siblings together is a high priority of the state of Minnesota, and is required by law in the "Foster Care Sibling Bill of Rights" Minn, Stat. 260C.008.

161.    It follows that the state's program for sibling placement must comply with the ADA and Section 504, providing accommodations and services to assure sibling placement with each other.  Nothing of this sort was provided by the Defendants.  To the contrary, they contrived and conspired to deceive the juvenile court with false statements and information that the Children had no bond with each other, were dangerous to each other, and actually had no human bonding ability.

162.    Stereotyping of the disabled children, incapable of love or receiving love, is repugnant to the ADA and related law.  It was also completely false regarding N.J. and L.J.

163.    Almost immediately after St. Louis County took custody of the children in June 2016, they were permanently separated from each other.

164.    It is clear from the sworn testimony of foster provider Ms. Yoki on January 16, 2018, the report of the GAL Ms. Mahle on 9/1/16, and other documents, that the siblings were separated for the convenience, benefit, and financial interests of the foster homes and St. Louis County.

165.    It is equally clear that the Defendants were aware of their legal obligation to place the siblings together, and of the permanent harm to the Children by their failure to do so, as stated in their own guidelines and policies.

166.    The State's own review of the psychological research, as stated by the Defendant Commissioner of Health and Human Services, strongly indicates that sibling placement together is in their best interests:

> "Sibling relationships are empowering and critically important for them over the course of a lifetime. These relationships are bonds and most often are the longest meaningful connections in life. For those who enter foster care, being supported by their siblings can promote safety, well-being and a sense of security. **Sibling separation can cause long-term trauma** that would likely interfere with future relationships that they try to build. For the welfare of children, where one sibling is removed from the home, or all are removed but in separate placements, **their legal right is to remain connected and should not be limited.** See Minnesota Statutes 260.012 e (4); 260C.212, subdivision 2(d); and 260C.008."

*Sibling Bill of Rights Commissioner's Form*.

167.    It follows that Defendants were working against the best interests of the sibling children, at the same time also working against the Plaintiff's fundamental parental rights guaranteed by the U.S. Constitution.

168.    N.J. and L.J. were placed together for a month at Defendant Yoki's foster home, which has 9 to 10 children to care for; this number is over the legal limit of 5 established by the state regulations. Current federal regulations allow 6.

169.    Ms. Yoki stated that caring for both L.J. and N.J. was more work than she or the County was willing to support.

170.    Later in the chronology of this matter, Defendants would deceive the court on numerous occasions, attempting to cover up the unlawful separation of the siblings. To accomplish the "cover up", Defendants falsely stated that the children had no bond with eachother (or anyone

32

else), and that L.J. was a danger to N.J., for example by Defendant Ms. Thompson's report to the

juvenile court on October 24, 2017.

171.    The separation took place for the convenience of foster parents, as noted in the trial

transcript, Attorney Stromberg questioning foster parent Laura Yoki:

Q. Okay. When did L.J. leave your home?
A. I don't know the exact date. He was -- we had him for a month and a half, two months,
in that ballpark.
Q. How did it come to be that he was placed elsewhere?
A. I was exhausted. I was exhausted. I couldn't keep up with both the boys at one time.
Putting out L.J.'s fires, so to speak, to turn around, then, to do N.J.'s.

172.    The siblings were separated for the convenience and mutually beneficial business

interests of the foster home and St. Louis County.

173.    Not only that.  The siblings were separated as the result of difficult regressive

behavior caused by the Defendants themselves.

174.    The regressive behavioral issues were the result of the psychological trauma of

separation.  This traumatized behavior is predictable and accepted as scientific fact by authorities

including the federal courts of various jurisdictions, as enunciated further in paragraphs #237 and

#238 which follow below.

175.    It is sufficient to note at this point that both siblings had been cared for together, in

their own home, by Plaintiff Ms. Johnson and her partner Mr. Jorgenson, with little or no

individualized assistance from the Defendants, from birth to ages 3 1/2 and 6.  There was no history

of injuries or danger. There had never been any need for separation of the siblings.

176.    The children were manageable in their own home, by their own parents.

177.    It was the Defendants themselves who precipitated a predictable emotional crisis in

the brothers, by the sudden, cataclysmic disruption of their lives.

178.    Psychological science has long been aware of the consequences of such "adverse childhood events" upon developing children.  This has been further aggravated in Plaintiff's children due to their autism.

179.    Former President of the American Academy of Pediatrics, Dr. Robert Block, has stated "Adverse Childhood Experiences are the single greatest unaddressed public health threat facing our nation today".

180.    Ironically it is our State and County Dept. of Health and Human Services, in the name of "child protection", who have precipitated the "Adverse Childhood Experiences" for these two disabled children.

181.    L.J. was transferred to the Koop foster home for financial reasons, as they are licensed to receive special funding for high-needs children.

182.    To cover up their unlawful separation of the siblings, Defendants have conspired with each other to create the false narrative that the boys posed a danger to each other, such as alleged in the GAL Report 2-23-17.  All of the individual Defendants, at some point have gone on record to support this false narrative in records submitted to the juvenile court, such as the letter from Defendant Kelly Thompson to Defendant Dr. Carver on 10-24-17:

> "I was hoping to consult with you on the attachment relationships regarding these two siblings and the attachment capabilities regarding children with these diagnoses....."There has been significant violence between the siblings at visitations in the past with the parents to such a level that we had to end sibling visitation for their safety."

183.    On 8/15/2017 Kelly Thompson met with the County Attorney and stated, "We discussed the big concerns I had with trying to facilitate a sibling visit just because the parents want them together."

> "These two boys have exhibited zero attachment to each other and in fact we have documentation from a medical provider whose concerns were so high that she wrote a letter

34

to us stating she would recommend these two boys be placed separately due to the threatened and actual violence between the boys."

184.    All of the individual Defendants, including medical providers Dr. Brady and Carver who are referenced in the above statement by Defendant Thompson, conspired in this false and degrading narrative.

185.    Aside from these Defendant conspirators, no one else in the record corroborates Defendants' degrading narrative about the Children,  including numerous direct observations of professional observers, on multiple occasions, over a sustained period of time which include teachers, Lutheran Social Services ("LSS") observers of many visitations, and retired social worker Peter Krause in charge of many in-home visitations.

186.    Neither do the sustained observation of grandparents, family friends, nor acquaintances support in any way Defendants' narrative that the siblings were dangerous to each other or anyone else, or devoid of the natural attachment between siblings.

187.    Neither is there any record of injuries sustained by the Brothers over their entire lifetimes together in the family home, up to the ages of 3 ½ and 6 years old, when they were removed by the Defendants.

188.    Furthermore, the ADA requires individualized assessment of risk, which never occurred, pursuant to 29 CFR 139(b).  This is required because of situations exactly like Plaintiff's and her Childrens', where disabled individuals have historically been subject to discrimination.  For this reason, the law requires documentation with "objective evidence" of a "direct threat" to justify separation of the siblings.

"In determining whether an individual poses a **direct threat** to the health or safety of others, a **public entity** must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the

potential injury will actually occur; and whether **reasonable modifications** of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."

189.    Finally, even if some danger perchance existed, the ADA and Section 504 require accommodations and services to mitigate potential danger.  This was never evaluated nor provided.

190.    The very reason for this provision in federal law is to avoid exactly what has happened to Plaintiff and her Children. These unjustified removals have been historically perpetrated by public agencies such as the Defendants, imposing unnecessary restrictions upon the rights of disabled persons.

191.    Permanent separation of the siblings as soon as Defendants and St. Louis County gained custody, supports Plaintiff's observations at that time, that Defendants had no intentions of attempting reunification, and had every intention of dismantling the family.

192.    Plaintiff's emotional distress is the foreseeable consequence of Plaintiff's witnessing and understanding the trauma and permanent psychological injury to her children at the hands of the Defendants, under the pretext of "child protection".

193.    Plaintiff's emotional distress, caused by the Defendants themselves, was repeatedly invoked by the Defendants as one of the main reasons for termination of parental rights.

194.    A quotation from the CHIPS Petition states, "On June 15, Ms. Anderson was advised to obtain a police hold on behalf of L.J. and N.J. due to Ms. Johnson's observed instability during recent days, and the children's dysregulation when they saw their mother."  (paragraph "w") of both CHIPS and TPR Petitions.

195.    Yes, the Children were understandably frantic to return to their mother, home, and family.

196.    A quotation from the TPR Petition states: "Ms. Checketts recommended that the site of the visits be changed back to LSS due to her belief that Ms. Johnson's mental health was

36

hindering her ability to provide adequate care for her children, especially in light of their challenging and at times unsafe behaviors" (Petition for Termination of Parental Rights paragraph "nn" p. 27).

197.   Plaintiff's emotional distress caused by the Defendants is also well documented in her psychological evaluations ordered by the Defendants.

198.   Defendants' ongoing persecution of Plaintiff, whom they recorded and regarded as mentally disabled, and of the Sibling Brothers, violates the ADA, Section 504, and related law.

**DEFENDANTS UNLAWFULLY RESTRICTED PARENT-CHILD VISITATIONS**

199.   Parental visitations are considered a state program required to comply with the ADA and Section 504, according to the U.S. Department of Justice.

200.   Parental visitations with children in out-of-home placement are a high priority of Minnesota law as reflected in the child protection statutes Minn. Stat. Ch. 260C as follows.  Failure to attend visitations is evidence of "abandonment":

(a) Abandonment is presumed when: (1) the parent has had no contact with the child on a regular basis and not demonstrated consistent interest in the child's well-being for six months and the social services agency has made reasonable efforts to facilitate contact,

Minn. Stat. § 260C.301, subd. 2(a)

201.   Visitations are considered of such importance to the State, that a parent's failure to participate may result in termination of parental rights due to "abandonment".

202.   However, visitations were strongly discouraged by the Defendants.

203.   For example, three (3) year old N.J. had no parental visitations for the first two (2) months in County custody.  Such a long time for a three (3) year old, with understanding and coping skills limited not only by age, but cognitive and emotional disabilities.

204.    The records show that many other visitations were intentionally withheld between 2016 and 2018.

205.    At the same time as they were withholding visitations, Defendants were deceiving the juvenile court that they were taking place as required by law.

206.    For example the GAL stated in her report to the court of 9/1/2016 that "Visits are set up through Lutheran Social Services between mother and the boys, once a week for 1 hour". At that time, N.J. had no visits for the past 2 months.

207.    Defendants Ms. Anderson and Ms. Checketts, and GAL Ms. Mahle deceived the juvenile court regarding visitations, falsely stating that they were taking place on a regular basis. This deception took place continuously from 2016 through 2018.

208.    As an example, Defendants' TPR Petition in 2017-18 quotes a "Report to Court by social worker Hannah Checketts June 22, 2016 'Ms. Checketts developed a schedule for phone contact between Ms. Johnson and the children.  In addition to this, arrangements were made for supervised visits to begin"

209.    Defendants withheld both phone contacts and in-person visitations because, from the very beginning of their custody, Defendants' intention was to alienate the children, and terminate Plaintiff's parental rights.

210.    The withholding of visitations and phone contact as a matter of law is contrary to the best interests of the children.

211.    The withholding of visitations and phone contact has "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program [i.e. visitations] with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

38

212.    At one point in Jan-Feb 2017, visitations were going very well in Plaintiff's home, as per the home visit report of 1-17-2017 (Chronology p.115).   So well that retired social worker Peter Krause, who was supervising the visits, recommended expanding to unsupervised overnight visitations.

213.    Upon hearing this, Defendant social worker in charge at the time, Ms. Checketts immediately and summarily terminated all home visits on March  5, 2017.

214.    Defendants themselves have documented:

"Ms. Checketts recommended that the site of the visits be changed back to LSS due to her belief that Ms. Johnson's mental health was hindering her ability to provide adequate care for her children, especially in light of their challenging and at times unsafe behaviors" (Petition for Termination of Parental Rights, ¶"nn" at 27).

215.    This reasoning by Defendant Checketts has no relation to whether supervised visits occur in the home, or at LSS.  It was a subterfuge to derail the home visits, because those visits were going well, per observer Peter Krause

216.    Termination of home visits was done by Defendant Checketts for fear that the visits were going well, and might cause problems for Defendants' plan to terminate parental rights.  A petition to terminate was filed just two months later, on 5-4-2017.

217.    Defendant Checketts' termination of home visits violates state and federal law requiring that services to the disabled children, and to the Plaintiff, take place in the "most integrated" and "least restrictive" setting. The action by Defendant Ms. Checketts to terminate home visits, which was supported by the GAL and all other Defendants, was intentionally taken with "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program [visitations] with respect to individuals with disabilities;" in violation of 28 C.F.R. 35.130(3)(ii).

218.    In further support of denying visitations, Defendants deceived the juvenile court with multiple false reports that visitations with parents were problematic and unsatisfactory.

219.    This false narrative by the Defendants which was intended to deceive the juvenile court is documented, from the very beginning of legal proceedings in 2016, to the very end in 2018, and submitted by the Defendants in the "reestablishment" proceedings in 2022.

220.    Both the CHIPS Petition in June 2016, and TPR Petition in 2018 in their paragraph (w) make the same false statement:

> "On June 15, Ms. Anderson was advised to obtain a police hold on behalf of [L.J. and N.J.] due to Ms. Johnson's observed instability during recent days, and the children's dysregulation when they saw their mother."

> The TPR petition in 2018 states at ¶ "dd": "On July 8, Ms. Checketts submitted a report to the Court....Ms. Checketts reported that there were ongoing concerns regarding parental visitation and that both children exhibited increased negative behaviors following visits with Ms. Johnson."

221.    However, these reports are totally contradicted by the detailed reports of Lutheran Social Services staff who were physically present at the visitations to observe and report, and also contradicted by reports of Peter Krause, retired social worker, who supervised visitations in Plaintiff's home.

222.    One of the many examples of the visitation reports from professional observers at LSS stated:

> "N.J. gave mom, grandma, papa, and dad a hug when he came into the kitchen. L.J. came into the kitchen and gave grandma and mom a hug as well"..."L.J. shared his toys with N.J. after he opened them" [note L.J.'s birthday]..."The boys were trying to take turns with the game when another LSS worker took over the visit for the second half"

LSS Supervised Visit Summary (by Allie) — 3-26-17

223.    Reports are also quite clear that on most occasions the children did not want to leave the visitations, did not want to return to the foster homes, and rebelled during and immediately after the trips returning to the foster homes.

224.    For example, one official report from February 2017 notes N.J.'s resistance to leaving his parents after a visitation, and returning to the foster parent:

"[N.J.] really escalated as Aimee tried her hand getting him into his car seat in Lon's truck. … When he arrived he had his plastic bus that we had hoped would be a good transition item.  But this would not calm him.   Eventually Aimee and I buckled him in using brute force…" Chronology Summary  p.133/199 (circa. 2-9-2017)

225.    Another visit summary from 6-13-17 stated that N.J. threw himself on the floor, resisted getting into the car seat, threw toys, and asked Plaintiff to come with him in the foster home truck.

226.    The regressive, traumatic behavior was ignored by the Defendants. Worse, the Defendants deceived the juvenile court with an interpretation of events which they knew to be false: that contact with the parents, rather than separation, was causing the regressive behaviors.

227.    Defendants' TPR Petition at 21, ¶ "ff" states: "Ms. Checketts reported that visits between Ms. Johnson and her children had resumed.  Both foster parents informed Ms. Checketts that the children's behaviors regressed following the visits."

228.    Defendant Ms.Yoki testified at the TPR trial in 2018 that:  "[N.J.] seemed to not necessarily be so aware, maybe, if that's the right wording, of the visits? That eventually turned into that he was extremely destructive after the visits. It did, however, get to a point where he was uncontrollable after visits."

229.    Defendants also persistently and falsely reported to the juvenile court, that the children had no emotional attachment to their parents nor each other, as justification for

eliminating visitations with both siblings and parents together. This is further explicated paragraphs #261-#273 below.

230.    These false reports, and Defendants' withholding visitations, were made to justify breaking up the family, with "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program [reunification] with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

## DEFENDANTS PRECIPITATED AND PERPETUATED THE CHILDRENS' EMOTIONAL TRAUMA, PHYSICAL TRAUMA, BEHAVIORAL REGRESSION, AND INCREASING DISABILITY

231.    Defendants falsely reported to the juvenile court, in multiple reports from 2016 through 2018, by multiple individual Defendants, that the Children were doing well in foster care.

232.    Defendant social worker Ms. Checketts in her report to the juvenile court on June 20, 2016, reported "[N.J.] is doing very well in care"; and other reports to the court stated "The children are thriving in foster care".  Nothing could have been farther from the truth.

233.    Defendants' statements defy known scientific fact and the findings in other federal court cases regarding the trauma of separation, as well as the direct observations recorded of the regressive behaviors manifested by the Plaintiff's children in their foster homes.

234.    The trauma of separation of children from home and family is well established in the medical and legal literature. Plaintiff's children are a "textbook example" of the adverse psychological results of this trauma.

235.    The N.Y.U. Review of Law and Social Change [Vol. 43:523 2019] reports on "THE HARM OF CHILD REMOVAL":

### 2. Trauma Inherent in the Act of Removal
Most notably, Dr. Mitchell reports that the simple act of removal, without regard to what happens afterwards, has significant effects on children. She states that while generally an

adult might think of removal as a "quick, isolated, onetime event," for a child, it is a "significant turning point . . . that many children will relive over and over again in their minds." This undoubtedly causes children immense trauma as they replay this horrible moment in their lives.

**3. Grief and Confusion Due to Separation from One's Family**
Dr. Mitchell also documents the feelings of grief and ambiguity that occur when a child is separated from her family, as well as the stress that follows. This is yet another distinct harm of removal. Dr. Mitchell identifies "guilt, post-traumatic stress disorder, isolation, substance abuse, anxiety, low self-esteem, and despair" as just some of the consequences that result from a failure to deal with these feelings of grief. She concludes that children who are removed may mourn the loss of their parents as much as if they had died."

**"Adding to the trauma is the possibility of separation from a sibling. Foster homes often cannot accommodate multiple children."**

…

236.    Another study by Harvard University is entitled " **Study Finds Foster Kids Suffer PTSD"**

*"Foster children are twice as likely as U.S. war vets to be afflicted with Stress Disorder"*

Former foster children are almost twice as likely to suffer from Post-Traumatic Stress Disorder (PTSD) as U.S. war veterans, according to a study released Wednesday by the Harvard Medical School (HMS), the University of Michigan and Casey Family Programs…

Contributing Writer April 11, 2005

237.    The federal courts have acknowledged the medical studies which document the severe damage to children, by the trauma of separation.

238.    In the 2018 California case of Ms. L. v. U.S. Immigration & Customs Enforcement, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) the district court found:

"there is ample evidence that separating children from their mothers or fathers leads to serious, negative consequences to children's health and development." Id. at 1146.

Forced separations "put[] children at increased risk for both physical and mental illness . . . . And the psychological distress, anxiety, and depression associated with separation from

43

a parent would follow the children well after the immediate period of separation—even after eventual reunification with a parent or other family." Id. at 1147.

…

Separation from family leaves children more vulnerable to exploitation and abuse, no matter what the care setting. In addition, traumatic separation from parents creates toxic stress in children and adolescents that can profoundly impact their development. Strong scientific evidence shows that toxic stress disrupts the development of brain architecture and other organ systems, and increases the risk for stress-related disease and cognitive impairment well into adult years. Studies have shown that children who experience such traumatic events can suffer from symptoms of anxiety and post-traumatic stress disorder, have poorer behavioral and educational outcomes, and experience higher rates of poverty and food insecurity.  Id.

The court pointed to other evidence establishing "that separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." Id.

Ms. L. v. U.S. Immigration & Customs Enforcement, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).
(see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111 (D.D.C. 2018);  Nicholson v. Williams, 203 F. Supp. 2d 153 (E.D.N.Y. 2002); Nicholson v. Scoppetta, 3 N.Y.3d 357 (2004); Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enforcement, 319 F. Supp. 3d 491 (D.D.C. 2018)

239.    In another case, the court relied in part on expert testimony regarding the harm that occurs as a result of child-parent separation. Noting that "attachment between parent and child forms the basis of who we are as humans" and that the continuity of "that attachment is essential to a child's natural development," 203 F. Supp. 2d at 198-99, plaintiffs' experts testified that removal of children from parents results in:

      — fear and anxiety;
      — diminished sense of stability and self;
      — despair accompanied by hyper-vigilant looking, waiting, and hoping for parents' return;
      — heightened sense of self-blame. Id. at 199.

The experts also noted that "another serious implication of removal is that it introduces children to the foster system which can be much more dangerous and debilitating than the home situation." Such dangers include:

      — risk of additional exposure to domestic violence;

— increased risk of abuse and child fatality;
— lack of adequate medical care; and
— disruption of contact with community, school, and siblings.

Nicholson v. Williams, 203 F. Supp. 2d 153, 198-199 (E.D.N.Y. 2002)

240.    It comes as no surprise to find that the scientific evidence is corroborated by the behavioral changes manifested by Plaintiff's Children after removal from their home, and separation from each other.

241.    In courtroom testimony foster provider Koop described L.J.'s behavior, when he "screams", "tantrums", "swears", "sweats" and tells her "You're not the boss of me."

242.    Koop testified before the juvenile court on January 16, 2018, regarding the behavior of L.H., that:

"I have a small half-bath off my living room area. And when he needs to have a tantrum, it's our practice to go in the potty room to say potty words. **And I would go in there with him and actually wear rifle range protection headgear. The screaming is that excessive. And he could manage that --- he could scream and carry on and jump and kick and swear for well over an hour."**

**"And those were common. They might happen several times a day.** And it would over a snack. It would be over, it's time to get your pajamas on. It could be over he didn't think he liked the dinner. **Any little trigger could trigger that kind of a tantrum."**

**"And, in fact, he'll say that. "You're not the boss of me. Don't tell me what to do. I'm not going to do what you want me to do."**

*Transcript of proceedings on 1-16-18  at 135:1-25;136:1-3* (emphasis added).

243.    None of these extreme behaviors took place prior to placement in the foster home.

244.    Defendant Hannah Checketts on Sept. 14, 2016, corroborated by other Defendants GAL and foster parent Yoki, describes N.J.'s behavior:

"Since placement, N.J.'s foster parents have noted ongoing behavioral concerns.  N.J. generally gets up between 3:00-5:00 AM in the morning.  He wakes up screaming and then begins to bang and break things in his bedroom.  In the past few weeks he has broken the

45

closet door and organizer.  His bed is bolted to the wall now so he cannot push it around the room or cause injury to himself."

"N.J. is also able to undress himself during overnight hours.  When his foster parents check on him they often find the inside of his diaper spread across his room.  They have tried to find ways to prevent him from removing his clothes (cutting off the feet of pajamas and putting them on backwards), however these efforts have been unsuccessful.  If N.J. has had a BM, they will find feces strewn about the bedroom, covering the walls, bedding, and himself."

From "Update to the Court" dated Sept. 14, 2016 by Hannah Checketts.

245.    Defendant Yoki, N.J.'s foster provider, testified on January 16, 2018 as to then four

(4) year old N.J.'s "uncontrollable" behavior after being forced to leave visitations with his

parents:

"He seemed to not necessarily be so aware, maybe, if that's the right wording, of the visits?  That eventually turned into that he was extremely destructive after the visits. It did, however, get to a point where he was uncontrollable after visits."

*Transcript of proceedings on 1-16-18  at 109*

"Q. There was recently a birthday party for [N.J.] at a visit; is that correct?
A. Um-hum.
Q. How was [N.J.'s] behavior after that visit?
A. My husband said that he cried and kicked the van all the way home. And he got home and he was really upset. And Lon was telling me about how he was on the way home.
And then I heard the toilet flush, and I went running in there, and he had flushed down -- we have a soap dispenser on the wall, so the top of the soap dispenser is about so big, and so it broke in half when it started going through the pipe, so half of it got stuck in the toilet. Half of it got stuck in the pipe along the way, which led to another new toilet, because we had to take the toilet off the floor, and it eventually broke when we were trying to get the part out.

*Transcript of proceedings on 1-16-18  at 113, 114.*

246.    N.J. displayed none of these behaviors while at home with parents.  The behaviors

are the manifestation of severe psychological trauma to the autistic three (3) year old boy.

247.    N.J.'s and L.J.'s behaviors mirror one of the comments made by a foster care child,

about his own experiences, in response to the Harvard Study cited above:

46

"And yes, it is a horrible feeling to be a child and lay in bed every night, and worry about what is going to happen to you. And that is on top of the pain and confusion you feel about your parents, and why they didn't want you, or wondering what is wrong with you to make people not love or want you. I remember crying myself to sleep every night, sometimes crying in my sleep all through the night. And these feelings started at the age of 3 or 4, and have never went away."

248.    The trauma of separation was ignored by medical providers working in concert with the other Defendants.  For example Defendant Dr. Carver fails to note N.J.'s extreme behaviors, fails to comment in any way regarding the trauma of separation, even while noting N.J.'s detachment during her observations in the Yoki home in her report of 12-28-16 p.6.

249.    None of the extreme behaviors as described above took place prior to St. Louis County involvement, while the children were in their home, under care of their mother Plaintiff Aimee Johnson.

250.    In addition to the Children's well documented behavioral regression, the trauma of separation also caused a cognitive decline in functioning, which again was ignored by the Defendants.

251.    In addition to the behavioral abnormalities as noted above, cognitive decline is also an accepted scientific fact, associated with the stress experienced by N.J. and L.J..  This has been noted by the federal courts as cited in paragraphs #237 and #238 above.

252.    The Childrens' cognitive and functional decline is the predictable result of the stress resulting from their separation from family and each other, as a consequence which is well established by leading authorities on child development.

253.    One such authority states:

Extensive research on the biology of stress now shows that healthy development can be derailed by excessive or prolonged activation of stress response systems in the body and the brain, with damaging effects on learning, behavior, and health across the lifespan. Yet policies that affect young children generally do not address or even reflect awareness of the degree to which very early exposure to stressful experiences and environments can

47

affect the architecture of the brain, the body's stress response systems, and a host of health outcomes later in life.

National Scientific Council on the Developing Child (2005/2014).
*Excessive Stress Disrupts the Architecture of the Developing Brain: Working Paper No. 3.* Updated Edition. Retrieved from www.developingchild.harvard.edu.

254.    L.J.'s grades deteriorated, and standardized test scores deteriorated in 2016 after separation, compared to the year prior to separation.

255.    N.J.'s cognitive abilities showed a decline during this same period, as documented in the evaluation of Dr. Carver in September, 2016.

256.    In some 3000 pages of Defendants' court proceedings, reports, and evaluations, including those of medical professionals, amidst the platitudes that bear upon "the children's best interests", not one word is uttered regarding the effects of traumatic separation, nor of attachment to parents and family.

257.    Defendants' silence on these important and well-established developmental issues as they pertain to N.J. and L.J., especially in view of the Boys' extreme changes in behavior, speaks volumes as to Defendants' malicious intentions, come what will, to separate the Children and Family.

258.    Defendants' indifference to the Children's emotional and cognitive regression demonstrate their willingness to sacrifice the well-being of the Children, in exchange for Defendants' plan to break up the family, in furtherance of Defendants' mutually beneficial interests in their foster care and "child protection" businesses.

259.    The emotional and cognitive regression, in addition to the suffering, caused and intentionally perpetuated by the Defendants upon the Children violates the best interests of the Children, solely for the purpose of supporting Defendants' interest in termination of Plaintiff's

48

parental rights. The children's "best interests" therefore cannot be invoked to justify termination of Plaintiffs parental rights, as would be required by the dictates of the U.S. Constitution.

260. The emotional and cognitive regression, in addition to the suffering, caused and intentionally perpetuated by the Defendants, is the opposite of the policy and purpose of the ADA, Section 504, and related state and federal law. Defendants' actions have "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

261. Defendants' unlawful actions were taken in furtherance of their conspiracy to separate the Children from each other, parents, and extended family including grandparents.

262. Defendants' unlawful actions as alleged herein culminated in February 2018 with successful termination of parental rights, permanent separation of the disabled siblings from each other, and permanent separation from grandparents and other extended family.

## DEFENDANTS INTENTIONALLY DEHUMANIZED, STEREOTYPED, AND DEGRADED THE DISABLED CHILDREN

263. Defendants persistently stereotyped, degraded, and dehumanized the disabled Children, stating that they were incapable of bonding nor emotional attachment to other humans.

264. Defendants persistently and repeatedly alleged that the Siblings had no bond nor emotional attachment to each other nor to their parents.

265. Defendants made these allegations intentionally to deceive the juvenile court, and thereby justify the Childrens' forced separation from each other, their parents, and their family.

266. This stereotypic labeling of the Children was propounded exclusively by the Defendants themselves, who all agreed with the stereotype to justify separation. No person outside the circle of conspiring Defendants ever put forth such observations or opinions.

267.    All of the Defendants, including medical providers Brady and Carver, either participated directly or acquiesced in this offensive labeling.

268.    The falsity of this stereotype, and its origination by agreement among the Defendants, is obvious by comparison to hundreds of other contrary observations on the record, of affection and bonding between the Children, each other, and their parents.

269.    The absurdity of this stereotype is apparent by both "common sense", universally accepted truth, and also scientific knowledge of parent-child "attachment".

270.    The stereotypic labeling of these disabled children offends the core idea of "dignity and respect" "enshrined" in the ADA,  noted as recently as 2022 by presidential proclamation:

271.    "The ADA prohibits disability discrimination by State and local governments; provides standards for access to places of public accommodation; protects people with disabilities from discrimination in the workplace; and ensures equal access to health care, social services, transportation, and telecommunications.  **But even more than that, it enshrines the idea — central to the spirit of our Nation — that all of us are deserving of equal dignity, respect, and opportunity...."**

White House Presidential Proclamation July 25, 2022.

272.    This false labeling of the children was repeated by multiple Defendants, in multiple reports intended to deceive the juvenile court, on multiple occasions between 2016 and the present. The false stereotype was featured in the courtroom testimony of several Defendants in the trial for termination of parental rights on January 16, 2018.

273.    At the termination trial of January 16, 2018 Defendant assistant county attorney Mr. Stromberg had coached the foster care providers to advance this false narrative and to thereby deceive the juvenile court.

274.   L.J.'s foster provider, Defendant Ms. Koop stated at the behest of questioning by Mr. Stromberg:

> Q. Okay. In your experience, **does he have -- are you able to see, like, a strong bond between L.J. and his parents? Or L.J. and anybody else?**
> A. No. I have not seen mom and dad with L.J. on very many occasions throughout the year and a half, so, you know, I don't have lots of knowledge there. **But, no, I don't see L.J. as able to form significant emotional connection between people.**

*Transcript of proceedings 1-16-2018, at 159:1-17.*

N.H.'s foster provider, Defendant Ms. Yoki stated under questioning by Mr. Stromberg:

> Q. Okay. How would you describe N.J.'s attachment to people?
> A. I don't think that he necessarily has an attachment.
> Q. Not anybody?
> A. No.

*Transcript of proceedings 1-16-2018 at 120.*

275.   The uniformity between the Defendants of their degrading and unlikely narrative, in view of strong scientific precepts to the contrary, and strong observations of third parties to the contrary, supports the existence of a conspiracy between the Defendants.

276.   Not only was the stereotyping used by Defendants for the purpose of breaking up the family, but on the basis of stereotyping the Children by their disabilities, Defendants' "patronizing" narrative routinely denied N.J. and L.J. the most basic considerations of a "normal" childhood, stating outright that the Boys were mentally incapable of appreciating such cherished activities as birthdays, Christmas, gatherings with family.

277.   The ADA rules promulgated by the U.S. Department of Justice, citing from the U.S. Supreme Court, decry such stereotyping as Defendants have used to degrade N.J. and L.J. for the purpose of denying ADA and Constitutional rights of the Children and their mother the Plaintiff.

278.    The Dept. of Justice Rules state that "[t]aken together, the[] provisions [in 28 C.F.R. § 35.130(b)] are intended to prohibit exclusion . . . of individuals with disabilities and the denial of equal opportunities enjoyed by others, **based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities.** Consistent with these standards, public entities are required to ensure that their actions are based on facts applicable to individuals and not presumptions as to what a class of individuals with disabilities can or cannot do." c.f. School Bd. of Nassau County v. Arline, 480 U.S. 273, 285 (1987).

28 C.F.R. § 35.130(b); and 28 C.F.R. pt. 35, App. B (explaining in the 1991 Section-by-Section guidance to the Title II regulation)

279.    This "patronizing", "stereotypic", and condescending narrative aimed at the disabled children and the Plaintiff is apparent in statements and actions of Defendants such as that by Defendant Ms. Thompson in the pretrial report to the juvenile court of 1-4-18, documenting Defendants' patronizing opinions, including the assertion that N.J. "didn't seem to have the cognition to really understand" birthdays, Christmas, family, etc.

280.    Defendant Ms. Thompson's report states:

"On 12/4/17 I discussed with Aimee her wanting to have a visit with both boys and several family members to celebrate [N.J.'s] birthday.  I cautioned her that this sounded very overstimulating for both boys and that they didn't handle changes in their routines very well and that adding on top of re-introducing them together that here would suddenly be family members that they hadn't seen in a while and presents and chaos.  Aimee indicated that they had always had birthday parties for the boys when they were with them.  I reminded her that they have not been in her care for a year and a half and that they have a **new normal** when it comes to what they are "used" to.  **I further asked Aimee if N.J. was really aware of his birthday and if a party was necessary for him given that he didn't seem to have the cognition to really understand this**....I indicated that I would need to take this under advisement and check with the GAL and our county attorney.  I further consulted with my supervisor....L.J. would not be able to come for safety reasons....**Aimee was not happy with this decision and further asked me to reconsider allowing the boys to have a family visit for Christmas as this time of year is about family** and that it wasn't nice of me not to allow this since they have followed all the rules.  **I reminded Aimee that my role wasn't about being nice but rather to gauge the necessary safety**

**of her children and make decisions in consultation with those involved with the case on what was best for them."**

281.    As stated by Defendant Thompson above, many of the other Defendants including the GAL, attorneys, and supervisors were consulted and agreed in these unlawful, "stereotypic", and "patronizing" actions and attitudes toward the disabled children, the Plaintiff, and their family.

282.    The Defendants clearly have eliminated the family from decisions.  Defendants forbade family Birthdays and Christmases to the Children, as well as virtually all other family planning and decisions.

283.    Aside from the Defendants' ulterior motives, and aside from the false aspersions of "no attachments", the usurpation of family decision making is contrary to state and federal law enacted to prevent situations such those experienced herein by the Plaintiff and family:

> "(c) Policy.--It is the policy of the United States that all programs, projects, and activities receiving assistance under this title shall be carried out in a manner consistent with the principles that—
>
> > (3) individuals with developmental disabilities and their families are the primary decisionmakers regarding the services and supports such individuals and their families receive, including regarding choosing where the individuals live from available options, and play decisionmaking roles in policies and programs that affect the lives of such individuals and their Families;"

Developmental Disabilities Assistance and Bill of Rights Act of 2000". 42 USC 15001(c)(3).

284.    Numerous observations of third parties in other parts of the record, as well as the testimony of Parents and other family members, document affectionate behaviors and emotional attachments of the siblings between each other, their parents, and other family.

285.    The parents' observations regarding the bond between the two Children were completely ignored, contrary to all pertinent law regarding the supremacy of the family as the decision makers.

286.    The family's recognition of the sibling bond is evidenced by courtroom testimony by the Childrens' father Mr. Jorgenson:

> "The boys have always been caring and loving towards each other. They would often play together. They would build blocks, towers together. They would often just -- they would sit together on the couch and watch Mickey Mouse Clubhouse. They would engage with each other in a positive manner before this incident happened."

*Transcript of proceedings 1-16-2018, at P. 35:11-16.*

> "Because they would play together. And he would always kiss N.J. on the head. When he'd come home from school, that was the first thing L.J. did. Always wanted his brother."

*Ibid., at 53:9-12.*

287.    The law is diametrically opposed to Defendants' actions, who substituted their own scientifically and legally unsupported practices, while degrading the parents' observations and aspirations, such as those stated above by the Children's father and mother.

288.    The law stresses the importance of "family-directed" support services, and family "decisionmaking authority and control regarding the nature and use of services and support". This has been plainly stated and reiterated by Congress, as in 42 U.S.C. 15091b(1):

> The purposes of this subchapter are—
> **(1)**to promote and strengthen the implementation of comprehensive State systems of family support services, for families with children with disabilities, that are **family-centered and family-directed**, and that provide families with **the greatest possible decisionmaking authority and control** regarding the nature and use of services and support;

289.    In addition to the falsity of the narrative, and the ulterior motives behind Defendants' statements, the derogatory stereotyping is an insult to the Childrens' personal dignity which violates the very essence of the ADA and related law.

290.    Defendants' false stereotyping of the disabled children was not done for their best interests, but rather was done instead for the purpose of terminating Plaintiff's fundamental rights protected under the U.S. Constitution.

291.    Defendants' false statements, ulterior motives, and labeling of the disabled children are the opposite of the policy and purpose of the ADA and Section 504.

292.    Defendants' actions have "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

293.    Defendants' unlawful actions were taken in furtherance of their conspiracy to separate the Children from each other, parents, and extended family, including grandparents.

294.    Defendants' unlawful actions as alleged herein culminated in February 2018 with successful termination of parental rights, permanent separation of the disabled Siblings from each other, and permanent separation from grandparents and other extended family.

## DEFENDANTS INTENTIONALLY FAILED TO CONSIDER PLACEMENT WITH GRANDPARENTS

295.    The State of Minnesota by statute requires placement with relatives, as a first priority, for children in need of protective services.

296.    The State's program for placement with relatives is codified in the child protection statutes, Minn. Stat. 260C.221; 260C.212 Subd.2; 260C.607 Subd.6e(1).

297.    As a state program, placement of the disabled children with relatives requires individualized assessment, services and supports as necessary, to effectuate the goals of the program, pursuant to the ADA and related law.

298.    Defendants made no efforts, no individualized assessments, nor services, nor supports to effect placement with relatives.

299.    Defendants falsely stated to the juvenile court that efforts were being made to effect placement with relatives.

300.    L.J. and N.J, prior to removal from their home, had a close and positive relationship with their grandparents.  It has now been destroyed by the Defendants.

301.    After the Childrens' removal from their home, documents show that visitations with grandparents were healthy and positive.

302.    Grandparents volunteered to take permanent custody of the children, in the event that Plaintiff lost her parental rights.  Grandparents wrote a letter directly to the judge on 4-28-17 expressing their willingness to care for the children.  This was noted in reports of the GAL.

303.    Defendant Thompson in April 2017, whilst denying Grandmother's request to raise the Boys, told grandmother "they were not looking to place the children together".

304.    However Defendants deceived the juvenile court by stating they were making efforts to place the Children with relatives, while at the same time intentionally turning down the Grandparents' request.

305.    Defendants deliberately ignored the Grandparent's offer, and instead pursued their collective goal of placing the disabled children with strangers with whom they had a business relationship in the foster home industry.

306.    As a matter of law, the children's best interests reside in placement with relatives. The Defendants in this case never put this matter before the juvenile court.  They made the placement decision themselves.

307.    In addition to the placement with relatives as a requirement of state law, a second requirement of state law declares that the Children's best interests reside in permanency, which was not offered by the foster homes.

308.    Permanency is a recurrent theme and ultimate goal of the State, which is explicit in the statutes: Minn. Stat. 260C.001 Subd.2(b)(7); and Subd. 3.

309.    Minnesota courts have long recognized the importance of permanency in its child protection program:

> Permanency has also long been recognized in the jurisprudence. Minnesota courts have recognized that "long-term placement [in foster care] is often inconsistent with * * * the right of all children to live in families that offer a safe, permanent relationship with nurturing parents or caretakers and have the opportunity to establish lifetime relationships." *Matter of Welfare of D.C.*, 415 N.W.2d 915, 917 (Minn. Ct. App. 1987).

310.    Defendants intentionally acted against the children's best interests in failing to consider placement with relatives.

311.    Defendants intentionally acted against the children's best interests in failing to consider permanency by placement with relatives, and to the contrary, in making placement where permanency was in question.

312.    Defendants took intentional actions against the children's best interests in permanency and placement with relatives.  The child's best interests are the sole reason for which the U.S. Constitution allows abrogation of parental rights. Termination of Plaintiff's parental rights, against the child's best interests, violates the U.S. Constitution.

313.    Defendants intentionally failed to provide individualized assessments and services for the disabled individuals, to effectuate the two statutory priorities of permanency and placement with relatives, in violation of the ADA, Section 504, and related law.

314.    Defendants failed to offer services to the grandparents, to facilitate the State's objective to place the Children with relatives, in violation of the ADA, Section 504, and related law.

315.    Defendants' reports to the juvenile court which falsely stated that efforts were made for placement of the Children with relatives, were made with "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's programs (i.e.

permanency and placement with relatives) with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

316.    Defendants' unlawful actions were taken in furtherance of their conspiracy to separate the Children from each other, parents, and extended family including grandparents.

317.    Defendants' unlawful actions as alleged herein culminated in February 2018 with successful termination of parental rights, permanent separation of the disabled Siblings from each other, and permanent separation from grandparents and other extended family.

## DEFENDANTS INTENTIONALLY FAILED TO PROVIDE APPROPRIATE INDIVIDUALIZED SERVICES TO REUNIFY THE FAMILY PURSUANT TO ADA REQUIREMENTS

318.    Minnesota law demands substantial efforts at family reunification, before proceeding to termination of parental rights.  Reunification constitutes the child's best interests as a matter of law.  Reunification is a state program subject to ADA requirements.

**"Duty to ensure placement prevention and family reunification; reasonable efforts.**

Once a child alleged to be in need of protection or services is under the court's jurisdiction, the court shall ensure that reasonable efforts, including culturally appropriate services and practices, by the social services agency are made to prevent placement or to eliminate the need for removal and to reunite the child with the child's family at the earliest possible time…"

*Minn. Stat. 260C.012(a)*.

319.    Defendants actively and deliberately worked against reunification.

320.    Because Plaintiff and her children are "qualified individuals with disability", Defendants actions to defeat reunification not only run afoul of state law, and the U.S. Constitution, but also the federal mandates of the ADA, Section 504, and related law as cited in paragraphs #373 and #374 below.

321.   The ADA, Section 504, and related state and federal law provide multiple programs, services, and resources to advance the state objective of reunification.  Defendants deliberately withheld these programs,  which are intended for families with special needs, for the Plaintiff and her family.

322.   Defendants deliberately withheld these beneficial programs for fear that they would jeopardize their plan to separate siblings, terminate parental rights, and further the business relationships within their "child protection" and "foster care" businesses.

323.   But for Defendants' failure to provide these mandated programs, there would be no termination of Plaintiff's parental rights.

324.   Defendants intentionally derailed the state's objective to reunify the family, for example when Defendant Ms. Thompson terminated all home visits on March 5, 2017 after the visitation supervisor Peter Krause had recommended the visits be extended to overnights at home.

325.   Defendants derailed the state's objective to reunify the family, for example by completely withholding parental visits with N.J. for more than two months after he was removed from Plaintiff's home, and routinely restricting N.J's visitations thereafter.

326.   Defendants subverted the state's objective to reunify the family, by their numerous, repeated, concerted, false, misleading, and derogatory statements to the juvenile court disparaging the Plaintiff and the children themselves.

327.   Defendants derailed the state's objective to reunify the family, by withholding services as required by the ADA as alleged above, and in paragraphs #373 and #374 below, because their goal from the outset was to break up the family, terminate parental rights, and acquire federal funding for the foster homes and child protection programs.

328.     Defendants constructed a sham "reunification plan", pretending to comply with their statutory obligation, but with the design and expectation that Plaintiff would fail.   As explained at trial by Defendant Mr. Stromberg, most parents fail the reunification plan made for them.

329.     The "reunification plan" was approved by the juvenile court on September 21, 2016, and on subsequent court reviews.  To the Defendants' surprise and disappointment, Plaintiff diligently and successfully complied with the plan, even though she had been told by Defendant Ms. Checketts on October 3, 2016, only two weeks after the reunification plan was approved by the juvenile court, that she would not have her children returned.

330.     Defendants made conflicting reports to the juvenile court.  At one point in early 2017, in a court review hearing on January 11, 2017 it was stated that Plaintiff was complying with the court's reunification plan. Later when compliance was seen to threaten their agenda to separate the family, Defendants falsely denied Plaintiff's compliance as noted below.

331.     Defendants Kelly Thompson falsely reported in her pretrial report to the juvenile court filed 1-5-2018 that Plaintiff had failed to comply with the reunification plan.

332.     For example, Defendant Thompson in the pre-trial report of 1-5-18 falsely stated to the juvenile court that Plaintiff had failed to complete the Circles of Security program as ordered. Plaintiff has provided her certificate of completion.

333.     For example, Defendants falsely reported to the juvenile court that Plaintiff had not properly participated in Dr. Kidd's autism education program at the Scottish Rite in Duluth.  (See GAL report to Court 7-27-17 p.5); Petition for Termination of Parental Rights paragraph "nn", p. 27). However, contrary to these false statements, Plaintiff completed the program, as attested by Dr. Kidd.

334.    Moreover, Defendants denigrated the Plaintiff and her participation in Dr. Kidd's program, by fabricating statements from Dr. Kidd disparaging the Plaintiff, and reporting the fabricated statements to the juvenile court.  Dr. Kidd has repudiated Defendants' false statements.

335.    The reunification plan was a sham.  It was set up by the Defendant social workers and County attorneys with the expectation that Plaintiff would fail the plan.  When Plaintiff successfully completed the reunification plan, Defendants nonetheless proceeded with their petition to terminate.

336.    Such efforts as these by Defendants, to demonstrate parental failure, have been recognized by Minnesota courts:

> "Efforts to help parents generally are closely scrutinized, because public agencies may transform the assistance into a test to demonstrate parental failure."  *Matter of Welfare of E.L.H.*, 356 N.W.2d 795, 798 (Minn.Ct.App.1984) (Crippen, Judge, concurring specially).

*In re Welfare of J.H.D.*, 416 N.W.2d 194, 198 (Minn. Ct. App. 1987).

337.    Defendants' false reports to the juvenile court, stating that Plaintiff had failed to complete her reunification plan, were actions by Defendants that had "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program –i.e. reunification– with respect to individuals with disabilities;" in violation of 28 CFR 35.130(3)(ii).

338.    Defendants' unlawful actions were taken in furtherance of their conspiracy to separate the Children from each other, parents, and extended family including grandparents.

339.    Defendants' unlawful actions as alleged herein culminated in February 2018 with successful termination of parental rights, permanent separation of the disabled Siblings from each other, and permanent separation from grandparents and other extended family.

**DEFENDANTS COVERED UP MALTREATMENT OF THE CHILDREN IN THE FOSTER HOMES**

340.     There is ample photographic and written documentation of unusual injuries to both L.J. and N.J. in the foster care of Defendants Ms. Yoki,  Ms. Koop, and St. Louis County.

341.     In all cases, the GAL and other individual Defendants were aware of these injuries. In all cases, the injuries were completely discounted, or simply ignored by the Defendants.

342.     In some instances visitations were withheld, in order that Plaintiff could not see and report the injuries.

343.     For example, multiple separate instances of human bite injuries to N.J. were noted and documented while in the Yoki foster care during the year 2017.  Defendants gave multiple conflicting explanations as to how these injuries occurred.

344.     There were injuries suggestive of cigarette burns, documented by photographic evidence.

345.     There were unusual bruise injuries to the head and neck, many documented by photographic evidence.

346.     Defendants never reported to the juvenile court these substantial injuries which were sustained while the Children were in the County's custody and care.

347.     On the other hand, Defendants were emphatic to report to the juvenile court, and devoted repeated attention to one or two alleged minor injuries, never documented, never substantiated, in years prior to 2016 while living at home.  The false reports of these non-existent injuries were made to the juvenile court, psychologists, and others, in their effort to undermine the Plaintiff.

348.     For example, there was a scratch on the forehead of L.J. reported by school authorities in 2015.  The scratch was investigated by the County, yet despite this was never

62

substantiated. Yet this insinuation of an injury appears multiple times, repeated by multiple Defendants on the record to deceive the juvenile court, and to degrade the Plaintiff.

349.     Plaintiff's visitations with N.J., which were promised in return for Plaintiff's consent to "voluntary" termination of parental rights, were discontinued in February 2018 when Plaintiff reported suspicious and substantial injuries seen and documented at visitation.

350.     Plaintiff's visitations with N.J. had been previously determined to be in the "child's best interests" by both the juvenile court and GAL Ms. Mahle when Plaintiff consented to terminate her parental rights on January 16, 2018, and again in the juvenile court order of February 7, 2018.  This is well documented on the record and in the trial transcript.

351.     Plaintiff and others, including observers from Lutheran Social Services, had noted unusual injuries on N.J, including human bite marks and facial bruising, during various visitations between 2016 and 2018.

352.     On February 6, 2018 Plaintiff noted suspicious bruising over N.J's right eye and face.  This was reported to social workers including Defendant Hannah Checketts.

353.     Plaintiff's visitations with N.J. were promptly terminated after she reported his injuries.

354.     Plaintiff's concerns were well founded, according to scientific research.  Foster children are subjected to abuse at a far greater rate than children in their homes, according to authorities:

> Despite the entire system being built on assumptions to the contrary, there is substantial evidence that children are more likely to be abused in foster care than in the general population (with their parents and other caregivers). The media is rife with stories of children abused in foster care,146 and studies show that these are not simply sensationalized anomalies. One study in Baltimore found the substantiated rates of sexual abuse in foster homes to be more than four times that of the general population.147 A similar study in Indiana found "three times more  physical abuse and twice the rate of sexual abuse in foster homes than in the general population.

N.Y.U. REVIEW OF LAW & SOCIAL CHANGE [Vol. 43:523 2019] THE HARM OF CHILD REMOVAL.

355.    In addition to the increased rates of abuse in foster care, the risk is multiplied further for disabled children, and underreported in children such as Plaintiff's, who have communication difficulties:

> "The rate of child abuse and neglect is at least 3 times higher in children with disabilities than in the typically developing population."

> "There is concern that the incidence of child abuse and neglect is underreported in part because many children with disabilities have communication difficulties and cannot directly report problems."

THE AMERICAN ACADEMY OF PEDIATRICS, Volume 147, Issue 5, May 2021.

356.    Defendants' casual dismissal of these injuries can only be explained by their overriding determination to avoid all obstacles to terminating Plaintiff's parental rights, continue the Children in foster care, and protect their relationship with the foster care businesses.

357.    As noted above, Defendants themselves had initiated an abuse investigation of the Plaintiff in 2015 (ultimately dismissed) when far lesser injuries, a scratch on the forehead, were noted on L.J. by school authorities.  Yet when far more suspicious injuries turned up in foster care, these injuries were ignored in deference to the business relationships within the foster care and child protection programs, and the Defendants' objective of breaking up Plaintiff's family.

358.    The Yoki and Koop foster homes, licensed by the State of Minnesota, participates in the state's child protection program, and receive federal funding through the County and State.

359.    The State of Minnesota programs for the "best interests" of N.J. as a disabled child, for child welfare, and for child protection, all were impaired by limitations placed on parental

contact, and by the complete and permanent termination of parental contact in February 2018, to avoid detection of abuse, maltreatment, and neglect.

360.    The State of Minnesota programs for the "protection" of N.J. from maltreatment, as a "qualified individual with disability" were impaired by termination of parental contact, to avoid detection of abuse and neglect.

> Neglect is associated with short-term and long-term effects on children's cognitive, socioemotional, and behavioral development. Neglect that occurs early in life can have more profound effects on development.

> Injury from abuse is augmented by the impact it has on the cortisol stress response and consequent physiologic impact. Adverse childhood experiences, including child abuse and neglect, cause physiologic disruptions that can persist into adulthood and lead to lifelong poor physical and mental health. Exposure to traumatic events is associated with significant negative effects on long-term cognitive development, such as IQ scores, language development, and academic achievement.

THE AMERICAN ACADEMY OF PEDIATRICS, Volume 147, Issue 5, May 2021.

361.    The actions of Mr. Stromberg and other Defendants to cover up maltreatment of N.J. and L.J. while in their custody had "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program (i.e. "protection" from maltreatment in the "child's best interests") with respect to individuals with disabilities," in violation of 28 CFR 35.130(3)(ii).

362.    Defendants' unlawful actions were taken in furtherance of their conspiracy to separate the Children from each other, parents, and extended family including grandparents.

363.    Defendants' unlawful actions as alleged herein culminated in February 2018 with successful termination of parental rights, permanent separation of the disabled Siblings from each other, and permanent separation from grandparents and other extended family.

## CAUSES OF ACTION

## COUNT 1

## DEFENDANTS HAVE WITHHELD "INDIVIDUALIZED ASSESSMENTS" TO "QUALIFIED INDIVIDUALS WITH DISABILITY", IN VIOLATION OF THE ADA, SECTION 504, AND RELATED LAW

For Count #1, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

364.    Plaintiff and her autistic children are "qualified individuals with disabilities" as defined by the ADA and Section 504.

365.    Defendants' child protection programs receive federal funding.

366.    "Individualized assessments" are required by the ADA et. al. to determine the most appropriate ways to accomplish the objectives of state programs for "qualified individuals with disability", including the Plaintiff and her Children.

367.    Many required assessments were not done at all, including but not limited to: Individual family assessment summary, as defined by Minn. Stat. 245.4871 Subd. 1.

368.    Whatever assessments were undertaken were done selectively and disingenuously, with the sole purpose of justifying Defendants' actions to terminate Plaintiff's parental rights, and to permanently separate the disabled children from each other.

369.    "Individualized assessments" compliant with the ADA would have determined the services and accommodations to allow Plaintiff's children to remain with their parents, siblings, grandparents, family, and home.

370.    Defendants' failure to provide "individualized assessments" for the Plaintiff and her disabled children caused injuries to the Plaintiff including, but not limited to, termination of parental rights, the loss of her children, Plaintiff's daily and ongoing psychological trauma caused

by the Defendants, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

### COUNT 2

**DEFENDANTS HAVE WITHHELD "INDIVIDUALIZED SERVICES" TO "QUALIFIED INDIVIDUALS WITH DISABILITY", IN VIOLATION OF THE ADA, SECTION 504, AND RELATED LAW**

For Count #2, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

371.    Plaintiff and her autistic children are "qualified individuals with disabilities" as defined by the ADA and Section 504.

372.    Defendants' child protection programs receive federal funding.

373.    "Individualized services" are required by the ADA tailored to accomplish the objectives of state programs for "qualified individuals with disability", including the Plaintiff and her children.

374.    Those state programs requiring "individualized services" and "accommodations" are listed in the paragraphs above, including but not limited to removal of children from their homes; reunification of the family; visitations; sibling rights, placement with relatives, best interests, and court proceedings.

375.    According to the U.S. Dept of Justice and U.S. Dept of Health and Human Services:

Agencies also have an obligation to ensure that the aids, benefits, and services provided to parents and prospective parents in support of appropriate service plan activities and goals – such as visitation, parenting skills training, transportation assistance, counseling, respite, and other "family preservation services" and "family support services" – are appropriately tailored to be useful to the individual.

376.    The "individualized services" required by law to sustain the family together, as required by the ADA et. al., were withheld from Plaintiff, her children, and her family including

but not limited to: "Family preservation services" 42 U.S.C. § 629a(a)(1), 45 C.F.R. § 1357.10(c); "Family support services42 U.S.C. § 629a (a)(2), 45 C.F.R. § 1357.10(c); "Family Support Services" required by ''Developmental Disabilities Assistance and Bill of Rights Act of 2000'' 42 U.S.C. 15002 (16)(C)(iv) defined in 42 U.S.C. 15002 (12)(A) ''Family Support for Families of Children with Disabilities'' 42 U.S.C. 15092(3) pursuant to federal policy stated in the Act that "all programs, projects, and activities funded under this title shall be family-centered and family-directed, and shall be provided in a manner consistent with the goal of providing families of children with disabilities with the support the families need to raise their children at home."

377.    State programs include but are not limited to: "Family community support services". — defined by Minn. Stat. 245.4871 Subd. 17;  "Professional home-based family treatment" --defined by Minn. Stat. 245.4871 Subd. 31; "Housing", pursuant to ''Developmental Disabilities Assistance and Bill of Rights Act of 2000'' 42USC 15002(14); Minn. Stat. 245.4871 Subd. 19 (8); Minn. Stat. 245.461 Subd. 4; "Individual family assessment summary", pursuant to Minn. Stat. 245.4881 Subd. 4; "Respite Care", required by "Developmental Disabilities Assistance and Bill of Rights Act of 2000" 42 U.S.C.A 14002(12)(B) and (16)(C)(ii), and defined by Minn. Stat. 245.492 Subd. 17;

378.    Plaintiff and her autistic children received no "individualized services" tailored to their needs. These include, but are not limited to the services as listed above, which include "respite care" and housing assistance which were specifically requested by Plaintiff and specifically withheld by the Defendants.

379.    Defendants at the pretrial hearing of January 4, 2018 listed the services provided to Plaintiff: (1) Random Urinalysis (2) Case Management (3) Foster Care (4) Northstar Kinship

Assistance (5) Supervised Visitations (6) Psychological evaluations (7) Gambling Assessment (8) DD/CADI waivered services (9) Diagnostic assessment.

380.    None of the many, extensive, and appropriate services listed in paragraphs #375 and #376 above appear on this list nor were offered.

381.    Furthermore, many of the so-called "services" listed were manipulated to work against the Plaintiff as demonstrated in the many paragraphs above, i.e. the "Foster Care", "Case Management", "Psychological evaluations", and others.

382.    "Individualized services" were deliberately withheld by the Defendants, because those services would defeat their goal to dismantle the family, separate Plaintiff from her children, separate the children from each other, and secure federal and state funding for foster care.

383.    Defendants' failure to provide "individualized services" and "accommodations" for the Plaintiff and her disabled children caused injuries to the Plaintiff including, but not limited to, termination of parental rights,  the loss of her children,  Plaintiff's daily and ongoing psychological trauma caused by the Defendants' maltreatment of her children, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

## **COUNT 3**

**DEFENDANTS REMOVED THE DISABLED CHILDREN FROM THEIR HOME, AND SEPARATED THE SIBLINGS FROM EACH OTHER, FROM 2016 TO 2018, WITHOUT ANY "DIRECT THREAT" TO THEM, IN VIOLATION OF THE ADA, SECTION 504, AND RELATED LAW**

For Count #3, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

384.    Plaintiff and her autistic children are "qualified individuals with disabilities" as defined by the ADA and Section 504.

385.    Defendants' child protection programs receive federal funding.

386.    Plaintiff's children were taken from her care and custody, from June 2016 through January 2018, at which time parental rights were terminated.

387.    The disabled siblings at ages 3 ½ and 6 were permanently separated from each other beginning in June 2016 through today.

388.    Due to the prejudice and the many past abuses suffered by disabled persons, the ADA mandates specific requirements to document and quantify a credible threat before separating children and families.

389.    Furthermore the ADA requires individualized assessment of risk, which never occurred, pursuant to 29CFR 139(b).  This is required because of situations exactly like Plaintiff's, where disabled individuals have historically been subject to discrimination.  For this reason, the law requires documentation with "objective evidence" of a "direct threat" to justify separation of Plaintiff from her children, and separation of the of the siblings from each other

390.    No "direct threat" to the children nor anyone in the family ever existed.

391.    No "direct threat" ever was demonstrated by the Defendants during any of the periodic reviews required by Minnesota law of the Childrens' "out of home placement" from June 2016 through January 2018.

392.    The continued removal of Plaintiff's children from their home, and their separation from each other, from 2016 onward, violated the ADA, Section 504, and related law.

393.    Defendants' removal of the disabled children from their home, and separation from each other, without any "direct threat" to anyone, caused injuries to the Plaintiff including, but not limited to, termination of parental rights, the loss of her children, Plaintiff's daily and ongoing psychological trauma caused by the Defendants' maltreatment of her children, and Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

## COUNT 4

**DEFENDANTS VIOLATED THE ADA WHEN THEY "DEFEATED THE OBJECTIVES OF THE PUBLIC ENTITY'S PROGRAMS" FOR CHILD PROTECTION BY THEIR DELIBERATE DECEPTION OF THE JUVENILE COURT WITH ALLEGATIONS AND INFORMATION WHICH THEY KNEW TO BE FALSE**

For Count #4, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

394.    Plaintiff and her autistic children are "qualified individuals with disabilities" as defined by the ADA and Section 504.

395.    Defendants' child protection programs receive federal funding.

396.    Plaintiff's children were taken from her care and custody, from June 2016 through January 2018 when Parental rights were terminated.

397.    The disabled siblings at ages 3 ½ and 6 were permanently separated from each other beginning in June 2016 through today.

398.    The child protection proceedings took place pursuant to Minn. Stat. Chapter 260C, "the child protection provisions of the Juvenile Court Act". These proceedings are a state program required to comply with the ADA and related law.

399.    Defendants deliberately deceived the juvenile court by many false or misleading statements throughout every phase and every aspect of the proceedings, as alleged more specifically by Plaintiff in the paragraphs above.

400.    The deliberate false statements of Defendants had "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities" in violation of the ADA, Section 504, and 28 CFR 35.130(3)(ii).

401.    Defendants' deliberate false and misleading statements to deceive the juvenile court caused injuries to the Plaintiff including, but not limited to, termination of parental rights, the loss of her children, Plaintiff's daily and ongoing psychological trauma caused by the Defendants' maltreatment of her children, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

## COUNT 5

### DEFENDANTS DEPRIVED PLAINTIFF OF FUNDAMENTAL PARENTAL RIGHTS PROTECTED BY THE U.S. CONSTITUTION

For Count #5, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

402.    Defendants at all times pertinent hereto were acting under color of state law.

403.    Defendants deprived Plaintiff of parental rights, which are protected as "fundamental rights" under the U.S. Constitution.

404.    Defendants pursuant to the U.S. Constitution are forbidden the abrogation of parental rights, except when done for the best interests of the child.

405.    This Constitutional right of Plaintiff was well established at the time of Defendants' actions herein.

406.    Defendants intentionally worked against the best interests of the child in many ways, as noted above, including but not limited to, separation of siblings, covering up maltreatment in the foster homes, withholding visitations, failing to evaluate placement with grandparents, withholding mandated services, incurring the psychological trauma of separation from family.

407.    Defendants worked against, and ultimately terminated, the parental rights of Plaintiff while at the same time working against the best interests of the children.

408.     Defendants deprived Plaintiff of parental rights in violation of the U.S. Constitution.

409.     Defendants' deprivation of Plaintiffs' fundamental rights protected by the U.S. Constitution caused injuries to the Plaintiff including, but not limited to, termination of parental rights, the loss of her children, Plaintiff's own emotional and psychological trauma caused by the Defendants' maltreatment of her children, Plaintiff's daily anguish caused by the Defendants, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

## COUNT 6

**DEFENDANTS' FALSE REPRESENTATIONS TO THE JUVENILE COURT DENIED PLAINTIFF OF DUE PROCESS GUARANTEED BY THE U.S. CONSTITUTION 14TH AMENDMENT.**

For Count #6, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

410.     Defendants at all times pertinent hereto were acting under color of state law.

411.     Defendants deprived Plaintiff of parental rights, which are protected as "fundamental rights" under the U.S. Constitution.

412.     Defendants pursuant to the U.S. Constitution 14th Amendment are forbidden against deprivation of parental rights without due process of law.

413.     This Constitutional right of Plaintiff was well established at the time of Defendants' actions herein.

414.     Defendants deliberately deceived the juvenile court by many false or misleading statements throughout every phase and every aspect of the proceedings, as alleged more specifically by Plaintiff in the paragraphs above.

73

415.    The intentionally false allegations and accusations by the governmental defendants and their foster home partners deprived Plaintiff of fair adjudications in the many proceedings which have taken place before the juvenile court beginning in 2016 through the present.

416.    The intentionally false allegations by the Defendants are amplified and aggravated by the juvenile court's dependency upon the Defendants as "the eyes and ears of the court".

417.    The false allegations made by the Defendants to degrade the Plaintiff before the juvenile court were obtained under the false pretext of giving assistance to Plaintiff.

418.    Defendants' deprivation of Plaintiff's due process rights protected by the U.S. Constitution caused injuries to the Plaintiff including, but not limited to, termination of parental rights, the loss of her children, Plaintiff's own emotional and psychological trauma caused by the Defendants' maltreatment of her children, Plaintiff's daily anguish caused by the Defendants, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.


## COUNT 7

**DEFENDANT COUNTY ATTORNEY MR. STROMBERG VIOLATED DUE PROCESS PROVISIONS OF THE U.S. CONSTITUTION 14TH AMENDMENT**

For Count #7, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

419.    The U.S. Constitution 14th Amendment forbids deprivation of parental rights without due process of law.

420.    Defendant Mr. Stromberg deprived Plaintiff of her fundamental parental rights without due process.

421.    Mr. Stromberg was the chief attorney for the child protection division of the St. Louis County attorney's office.  His actions constitute official policy of St. Louis County.

422.    Mr. Stromberg's actions were taken under color of state law.

423.    Plaintiff's due process rights under the U.S. Constitution were well established and known by Mr. Stromberg and St. Louis County at the time of his actions pertinent hereto.

424.    Mr. Stromberg as chief attorney of the child protection division prosecuted Plaintiff for termination of her parental rights on January 16, 2018.

425.    Mr. Stromberg induced Plaintiff to consent to a voluntary termination of her parental rights with the false promise of future parental visitations.

426.    Mr. Stromberg was aware that such a promise of future parental contact is not enforceable under Minnesota law, and thus unlawful as inducement for a voluntary consent.

427.    Mr. Stromberg induced Plaintiff to consent to "voluntary" termination without her understanding what she was consenting to.

428.    Mr. Stromberg colluded with Plaintiff's attorney to badger her into signing the consent for "voluntary" termination.

429.    Mr. Stromberg misled the juvenile court when Plaintiff attempted to rescind the voluntary termination on February 5, 2018, in failing to inform the court of Plaintiff's right to rescind the termination under Minnesota law.

430.    Mr. Stromberg reneged on the promise of visitations, which have been denied to Plaintiff, Mr. Jorgenson, and Grandparents.

431.    Defendant Mr. Stromberg's deliberate violation of Plaintiff's due process rights guaranteed by the U.S. Constitution caused injuries to the Plaintiff including, but not limited to, termination of parental rights, the loss of her children, Plaintiff's own emotional and psychological trauma caused by the Defendants' maltreatment of her children, Plaintiff's daily anguish caused

by the Defendants, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

## COUNT 8

**DEFENDANT COUNTY ATTORNEY MR. STROMBERG INTERFERED, COERCED, AND INTIMIDATED PLAINTIFF IN EXERCISE OF HER RIGHTS UNDER THE ADA, AND FOR AIDING HER CHILDREN PURSUANT TO THEIR RIGHTS UNDER THE ADA**

For Count #9, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

432.    The ADA 42 U.S.C. 12203 is entitled "Prohibition against retaliation and coercion".  It specifies that "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

433.    Mr. Stromberg as chief attorney of the child protection division prosecuted Plaintiff for termination of her parental rights on January 16, 2018.

434.    Mr. Stromberg induced Plaintiff to consent to a voluntary termination of her parental rights with the false promise of future parental visitations.

435.    Mr. Stromberg was aware that such a promise of future parental contact is not enforceable under Minnesota law, and thus unlawful as inducement for a voluntary consent.

436.    Mr. Stromberg induced Plaintiff to consent to voluntary termination without her understanding what she was consenting to.

437.    Mr. Stromberg colluded with Plaintiff's attorney to badger her into signing the consent for "voluntary" termination.

438.    Mr. Stromberg misled the juvenile court when Plaintiff attempted to rescind the voluntary termination on February 5, 2018, in failing to inform the court of Plaintiff's right to rescind the termination under Minnesota law.

439.    Mr. Stromberg interfered, coerced, and intimidated Plaintiff in the exercise of her rights for a fair trial and proceedings under Minn. Stat. 260C, and under the Minnesota Constitution, which are state programs and activities protected by the ADA and related law.

440.    Mr. Stromberg interfered, coerced, and intimidated Plaintiff in the exercise of her rights under state programs and law for preservation of her family and parental rights (ie Minn. Stat. Chapter 260C and the Minnesota  Constitution) in violation of 42 U.S.C.A. 12203(b).

441.    Mr. Stromberg interfered, coerced, and intimidated Plaintiff "on account of her having aided or encouraged [her Children] in the exercise or enjoyment" of their state law rights pursuant to Minn. Stat. Chapt. 260C, in violation of 42 U.S.C.A. 12203(b).

442.    Defendant Mr. Stromberg's deliberate violation of Plaintiff's rights pursuant to the ADA, Section 504, and related law, caused injuries to the Plaintiff including, but not limited to, termination of parental rights, the loss of her children, Plaintiff's daily and ongoing psychological trauma caused by the Defendants' maltreatment of her children, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

443.    Plaintiff is entitled to damages, injunctive and declaratory relief.

## COUNT 9

**DEFENDANT STROMBERG UNLAWFULLY FAILED TO PROVIDE PLAINTIFF, WHOM HE CONSIDERED AS DISABLED, WITH ADEQUATE EXPLANATION OF HER VOLUNTARY CONSENT FOR TERMINATION OF PARENTAL RIGHTS**

For Count #9, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

444.    Plaintiff was labeled as disabled by the Defendants, and considered as mentally disabled by the Defendants.

445.    Plaintiff was coerced by Defendant Mr. Stromberg on January 18, 2018 to give consent to "voluntary" termination of parental rights, under extreme emotional duress.

446.    Plaintiff was not provided by the governmental Defendants with any services to assist her in understanding the legal proceedings, and the effect of her action in consenting to "voluntary" termination of her parental rights.

447.    Defendant Mr. Stomberg furthermore convinced Plaintiff to sign her "voluntary" consent by the unlawful promise of future visitations.

448.    Defendant Mr. Stromberg's actions, including but not limited to, coercion and fraudulent promises of visitations, had "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program (i.e. Juvenile court and protection proceedings under Minn. Stat. Chapter 260C) with respect to individuals with disabilities;" in violation of the ADA, Section 504, and 28 C.F.R. 35.130(3)(ii).

449.    Defendant Stromberg's actions were done deliberately in furtherance of the conspiracy with the other Defendants to deny Plaintiff her rights under the ADA and related law, for the purpose of terminating parental rights, and advancing the financial and business objectives of the Defendants.

450.    Defendant Stromberg's actions to subvert the state court proceedings, coerce the Plaintiff, and deny her accommodations required by the ADA and related law, caused injuries to the Plaintiff including, but not limited to,  termination of parental rights,  the loss of her children, Plaintiff's daily and ongoing psychological trauma caused by the Defendants' maltreatment of her children, Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

451.    Plaintiff is entitled to damages, injunctive and declaratory relief.

## COUNT 10

### (ADA) RETALIATION FOR REPORTING ABUSE OF N.J.

### DEFENDANTS' UNLAWFULLY TERMINATED VISITATIONS WITH N.J., IN RETALIATION FOR PLAINTIFF REPORTNG HIS MALTREATMENT, AND FOR PLAINTIFF'S AIDING N.J. IN THE EXERCISE OF HIS RIGHTS

For Count #10, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

452.    The ADA 42 U.S.C. 12203 is entitled "Prohibition against retaliation and coercion".  It specifies that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter".

453.    Defendants retaliated against Plaintiff for complaining of maltreatment of her son N.J. The state program for reporting, investigating, and preventing maltreatment is subject to provisions of the ADA, Section 504, and related law pertaining to "qualified individual with disability".

454.    Plaintiff on numerous occasions between 2016 and termination of parental rights on Feb. 7, 2018 complained both formally and informally of maltreatment of her disabled son N.J. while in custody of St. Louis County, in the Yoki Foster Care Home.

455.    A formal complaint was made to police, St. Louis County, and social worker Defendant Ms. Checketts on February 6, 2018

456.    Defendant Ms. Checketts discriminated and retaliated against Plaintiff attempting to avail herself of the state programs for reporting of child maltreatment by permanently and forever terminating any contact between Plaintiff and her beloved son N.J., which had previously been promised to her, and which had been determined to be in the best interests of N.J.

457.    The ADA 42 U.S.C.A. 12203 also specifies that "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

458.    When Defendants terminated Plaintiff's contact with N.J., they intimidated and interfered with Plaintiff's aid and encouragement of the rights of N.J. to the state programs and objectives for protecting him from maltreatment, in violation of the ADA, Section 504, and related law.

459.    Defendants' retaliation, coercion, and interference against Plaintiff in violation of the ADA, caused injuries to the Plaintiff including, but not limited to, the permanent and ongoing loss of contact with her beloved son N.J , Plaintiff's own emotional and psychological trauma caused by the Defendants' maltreatment of her child, Plaintiff's daily anguish caused by the Defendants, Plaintiff's financial costs incurred by her since 2018 defending against placement of N.J. in the Yoki Foster Home.

460.    Defendants are liable for, and Plaintiff is entitled to, compensatory damages, injunctive, and declaratory relief.

80

## COUNT 11

### (Section 1983) RETALIATION FOR FILING SUIT

### DEFENDANTS UNLAWFULLY TERMINATED VISITATIONS WITH L.J., IN RETALIATION FOR PLAINTIFF FILING A LAWSUIT IN FEDERAL COURT

For Count #11, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

461.    Defendants at all times pertinent hereto were acting under color of state law.

462.    Defendants retaliated against the Plaintiff when she filed suit in federal court, on January 19, 2019.

463.    Defendants retaliated by permanently and forever canceling visitations with her 9 year old son L.J., which had previously been promised to her, and which had been determined to be in the best interests of L.J.

464.    Defendants' retaliation by permanent loss of any contact with her beloved child is sufficient to deter a person of ordinary firmness from litigation against the Defendants.

465.    This Constitutional right of Plaintiff was well established at the time of Defendants' actions herein.

466.    Defendants abrogated Plaintiff's right to petition, or right to file a lawsuit, which are protected as "fundamental rights" under the U.S. Constitution.

467.    Defendants are liable for compensatory and punitive damages, injunctive, and declaratory relief pursuant to 42 U.S.C.A. 1983.

81

**COUNT 12**

**(ADA) RETALIATION FOR FEDERAL SUIT DEFENDING ADA RIGHTS**

**DEFENDANTS' UNLAWFULLY TERMINATED VISITATIONS WITH L.J., IN RETALIATION FOR PLAINTIFF DEFENDING HER OWN ADA RIGHTS, AND AIDING L.J. IN THE EXERCISE OF HIS ADA RIGHTS**

For Count #12, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

468.   The ADA 42 U.S.C. 12203 is entitled "Prohibition against retaliation and coercion". It specifies that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter."

469.   Plaintiff filed suit in federal Court on January 19, 2019 to oppose the Defendants' termination of her parental rights.  Plaintiff's lawsuit requested that the federal court overrule the state court proceedings, and restore her parental rights, which request was denied for lack of federal jurisdiction over the claims Plaintiff had raised.  The action was dismissed without prejudice.

470.   The lawsuit did not seek relief under the ADA.  Nonetheless the lawsuit did "oppose acts and practices made unlawful" by the ADA, which implicates the protections against interference or retaliation proscribed by 42 U.S.C.A. 12203.

471.   Defendants discriminated and retaliated against Plaintiff's attempt to "oppose acts and practices made unlawful" by the ADA, by permanently and forever terminating any contact between Plaintiff and her beloved son L.J., which had previously been promised to her, and which had been determined to be in the best interests of L.J.

472.   The ADA 42 U.S.C. 12203 also specifies that "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account

of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

473.    When Defendants terminated Plaintiff's contact with L.J., they intimidated and interfered with Plaintiff's aid and encouragement of the rights of L.J. to parental contact, which had been determined by state authority to be in his best interests.

474.    Plaintiff is entitled to damages, injunctive and declaratory relief.

## COUNT 13

### VISITATION CONTRACT VIOLATED

### DEFENDANTS' REVOCATION OF PLAINTIFF'S VISITATIONS WITH HER CHILDREN VIOLATED THE CONTRACT MADE WITH HER AT THE HEARING ON JANUARY 16, 2018.

For Count #12, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

475.    Defendant Mr. Stromberg, on behalf of St. Louis County and the Defendant Commissioner of Human Services, made a binding agreement with Plaintiff, to give her visitations with her children L.J. and N.J., in exchange for her "voluntary" agreement to terminate parental rights.

476.    This agreement was documented in the transcript of court proceedings on 1-16-2018.

477.    This agreement was deemed to be in the best interests of the children, as documented in those proceedings.

478.    This agreement was ratified by the juvenile court on 2-7-2018.

479.    This agreement was broken by the Defendants within one year of its making.

480.    Defendant Stromberg re-affirmed in 2022 that the County had no intention of honoring the contract.

481.    This breach of contract nullifies Plaintiff's agreement to "voluntarily" consent to termination of her parental rights.

482.    The contract between Plaintiff and Defendants Mr. Stromberg/St. Louis County/Mn. Commissioner of HHS is void, by reason of its breach by the Defendants.

483.    Plaintiff's consent to "voluntary" termination of parental rights is void.

484.    Plaintiff requests this Court issue declaratory judgment, ruling that Defendants have breached the contract.

485.    Plaintiff is entitled to damages from the Defendants, caused by their breach of the contract.

486.    Plaintiff requests damages to be determined at trial by jury.

## COUNT 14

**DEFENDANTS IN 2022 VIOLATED ADA BY FAILING TO PROVIDE "INDIVIDUALIZED SERVICES" FOR REESTABLISHMENT OF THE LEGAL PARENT-CHILD RELATIONSHIP PURSUANT TO MINN. STAT. 260C.329**

For Count #14, Plaintiff restates and incorporates the allegations of the paragraphs above, and further states and alleges as follows:

487.    Minn. Stat. 260.329 ("Reestablishment Statute") is a state program to allow "Reestablishment of the Legal Parent-Child Relationship" if the child has remained in foster care for 4 years after termination of parental rights.

488.    Plaintiff in 2022 petitioned the state district court for "Reestablishment" of parental rights with L.J. under Minn. Stat. 260C.329.

489.    Plaintiff alleged most of Defendants' infractions recited in this Complaint, all of the best interests of L.J., and correction of any potential problems, as grounds for "Reestablishment".

490.    Defendants opposed Plaintiff's Petition, invoking all of the same reasons, with all of their same allegations against the Plaintiff, as grounds for denying the Petition.

491.    Plaintiff and her Children are "qualified individuals with disability" as defined by the ADA.

492.    According to the ADA and related law, Defendants are required to provide "individualized" assessments and services to L.J. and to Plaintiff to promote the state's program for  "Reestablishment".

493.    Continuing their violations of the ADA and related law, Defendants withheld "individualized" assessments and services as listed in the paragraphs above, appropriate to their situation, which would have allowed "Reestablishment".

494.    The assessments and services include those previously listed above, to promote parental rights and preservation of the family.

495.    In addition, the State of Minnesota and federal government in 2018 enacted another program to benefit Plaintiff and L.J., the "Families First Prevention Act of 2018".  This program to benefit Plaintiff and L.J. was also denied to them in 2022.

496.    Defendants in the 2022 proceedings again demonstrated their unlawful, deliberate, and malicious motivation to deny Plaintiff and L.J. their rights, because of the Defendants' overriding desire to separate Plaintiff, children, and family, and to promote their own business relationship with the foster care providers.

497.    Defendants' actions to deny Plaintiff assessments and services required by the ADA and related law, caused injuries to the Plaintiff including, but not limited to failure to Reestablish parental rights with L.J., the continued loss of beloved child L.J., Plaintiff's daily and ongoing psychological trauma caused by the Defendants' maltreatment of L.J., Plaintiff's financial costs incurred by her since 2016 defending against removal of her children.

498.    Plaintiff is entitled to damages, injunctive and declaratory relief.


## PRAYER FOR RELIEF

Wherefore, based upon the above violations of Plaintiff's rights pursuant to the ADA, Section 504, and related law; and based upon the above deprivations of Plaintiff's rights under the U.S. Constitution; and based upon Defendants' breach of the contract between themselves and Plaintiff providing rights of visitation with her children, Plaintiff is entitled to damages resulting from, but not limited to, (1) the loss of her children, (2) the termination of her parental rights, (3) the permanent psychological trauma to the Plaintiff caused by the Defendants, (4) the daily emotional suffering experienced by Plaintiff and caused by the Defendants, and (5) the costs, expenses, and attorney's fees incurred by Plaintiff in all prior efforts for vindication of her parental rights:

**Plaintiff prays this court for the following relief:**

1.    **UNDER COUNTS 1,2,3, AND 4**

1.1.    Declaratory judgment against all Defendants, finding that their actions have violated Plaintiff's rights under the ADA, Section 504, and related law; and

1.2.     Judgment against the Defendants, for violations of the ADA, Section 504, and related laws, jointly and severally, in their official capacities for compensatory damages in an amount to be determined by the jury.

2.     **UNDER COUNT 5**

2.1.     Declaratory judgment against all Defendants finding that their actions have violated Plaintiff's parental rights protected by the U.S. Constitution; and

2.2.     Judgment against the Defendants in their individual and official capacities, jointly and severally, excepting the agencies and officials of the State of Minnesota, and those with prosecutorial immunity, for compensatory and punitive damages in an amount to be determined by the jury, pursuant to 42 U.S.C.A. 1983.

3.     **UNDER COUNT 6**

3.1.     Declaratory judgment against all Defendants finding that their multiple, deliberate false statements to the juvenile court have violated Plaintiff's due process rights protected by the U.S. Constitution; and

3.2.     Judgment against the Defendants in their individual and official capacities, jointly and severally, excepting the agencies and officials of the State of Minnesota, and those with prosecutorial immunity, for compensatory and punitive damages in an amount to be determined by the jury, pursuant to 42 USC 1983.

4.     **UNDER COUNT 7**

4.1.     Declaratory judgment that Plaintiff's parental and due process rights were violated by Defendant Assistant County Attorney Mr. Stromberg when he gave false promises of visitations in exchange Plaintiff's consent to terminate parental rights; and the other

Defendants in conspiracy with him, in furtherance of their common objective to terminate the parental rights of Plaintiff; and

4.2.     Judgment against all non-immune Defendants, jointly and severally, in their official and individual capacities, for compensatory and punitive damages in an amount to be determined by the jury pursuant to 42 USC 1983.

5.     **UNDER COUNT 8**

5.1.     Declaratory judgment under ADA provisions against "coercion" and "interference" with Plaintiff's and her Children's rights to fair trial proceedings under state law, when Plaintiff was badgered and mislead by false promises, to consent to "voluntary" termination of parental rights;

5.2.     Judgement by this court for damages under the ADA and Section 504.

6.     **UNDER COUNT 9**

6.1.     Declaratory judgment that Defendant Stromberg intentionally failed to accommodate and provide services to Plaintiff as required by the ADA and Section 504, to enable her to adequately understand the "voluntary" consent extracted from her for termination of parental rights; and

6.2.     Judgment against the Defendants, for violations of the ADA, Section 504, and related laws, jointly and severally, in their official capacities for compensatory damages in an amount to be determined by the jury.

7.     **UNDER COUNTS 10 AND 12**

7.1.     Declaratory judgment and injunctive relief under ADA provisions against "retaliation" and "interference" with Plaintiff's and her Children's rights to visitations as found to be in their "best interests" under state proceedings pursuant to Minn. Stat. 260C,

88

because visitations with Plaintiff were terminated for N.J. when Plaintiff reported possible maltreatment in the foster homes, and for L.J. when Plaintiff filed a lawsuit in federal court to restore her parental rights;

7.2.      Judgment of this court declaring that termination of Plaintiff's visitations with N.J. and L.J. were unlawful under the ADA, and enjoining the Defendants to restore the visitations.

7.3.      Judgment against the Defendants, for violations of the ADA, Section 504, and related laws, jointly and severally, in their official capacities for compensatory damages in an amount to be determined by the jury.

## 8.      UNDER COUNT 11

8.1.      Declaratory judgment against all Defendants finding that their termination of parental visitations with L.J. in retaliation for Plaintiff's filing a lawsuit against them, has violated Plaintiff's fundamental right to petition protected by the U.S. Constitution; and

8.2.      Judgment against the Defendants in their individual and official capacities, jointly and severally, excepting the agencies and officials of the State of Minnesota, for compensatory and punitive damages in an amount to be determined by the jury, pursuant to 42 U.S.C. 1983.

## 9.      UNDER COUNT 13

9.1.      Declaratory judgment that Defendants' breach of contract voids her consent to "voluntary" termination of her parental rights; and

9.2.      Judgment against all individual Defendants jointly and severally, for compensatory and punitive damages in an amount to be determined by the jury, arising from their breach of contract to allow visitations between Plaintiff and her children.

10.     **UNDER COUNT 14**

10.1.     Declaratory judgment that Defendants intentionally failed to provide individualized assessments and services to Plaintiff as required by the ADA and Section 504, to enable her to "Reestablish" parental rights pursuant to Minn. Stat. 260C.329

10.2.     Judgment against the Defendants, for violations of the ADA, Section 504, and related laws, jointly and severally, in their official capacities for compensatory damages in an amount to be determined by the jury.

11.     **ATTORNEYS FEES**

11.1.     Judgement that Plaintiff be awarded reasonable costs and attorney's fees for this action, and related prior actions for the vindication of Plaintiff's parental rights pursuant to provisions of the ADA 42 U.S.C. and 42 USC 1988

12.     Grant such other and further relief as the court deems just and proper.


**JURY DEMAND**

Plaintiff hereby demands trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all claims and causes of action so triable.


Dated this August 8, 2023              */s/ Miles Ringsred*
                                        MILES RINGSRED
                                        State Bar No. (#0399640)
                                        1217 East First Street
                                        Duluth, MN 55805
                                        (218) 340-3699
                                        Miles.ringsred@gmail.com

                                        *Attorney for Aimee Renee Johnson*